In Equity.

HERBERT J. SAWYER *vs.* PASCAL P. GILMORE, State Treasurer.

Penobscot.　Opinion June 6, 1912.

*Assessment.　Benefits.　Constitutional Law.　Contribution.　Common School Fund.　Distribution.　Local Taxation for School Purposes.*

1.　That the method of levying the tax cannot be assailed. Section 8 of Art. IX of the State Constitution, which requires that "all taxes upon real or personal estate, assessed by authority of this State shall be apportioned and assessed equally according to the just value thereof," is fully met. No property escapes, no locality escapes, and the rate is uniform. There is no discrimination.

2.　That as a matter of fact the Legislature has made more generous provision for the education of children in unorganized townships than in incorporated places, as each scholar on the average in the townships received for the year ending April 1, 1911, $19 for school purposes, while the amount per scholar throughout the State averaged only $2.52.

3.　That the fact that this common school fund is distributed to the towns one-third according to number of scholars and two-thirds according to valuation, instead of all according to number of scholars, does not of itself render the act unconstitutional. Inequality of assessment is necessarily fatal, inequality of distribution is not, provided the purpose be the public welfare.

4.　The particular method of distribution rests in the wise discretion and sound judgment of the Legislature. The Constitution provides no regulation in this matter and it is not for the court to say that one method should be adopted in preference to another. We are not to substitute our judgment for that of a coördinate branch of the government working within its constitutional limits.

5.　That there is no force in the contention that because the town receives back from the State two-thirds of what it has paid to the State, therefore it can relieve itself from local taxation for other purposes than schools, and can devote the proceeds, when received, to the support of paupers, or the maintenance of roads, or the running expenses of the town, thereby making the unorganized townships contribute toward these local charges.

6. That section 6 permitting sums received from the State under this distribution "to be deemed to be raised by the municipalities within the meaning of R. S., c. 15, sec. 13, as amended" does not render the act unconstitutional as being in violation of Art. VIII of the State Constitution.

7. Article VIII imposes upon the Legislature the duty to require towns to make "suitable" provision for common schools at their own expense, but the Legislature alone is clothed with power to determine what is suitable and is thereby given a wide discretion, as the term "suitable" is elastic and varying, dependent upon the necessities of changing times.

In equity. On report. Bill dismissed.

Bill in equity brought by Herbert J. Sawyer of Mattamiscontis, an unorganized township in the County of Penobscot to enjoin the defendant, and his successors in office, from collecting a tax assessed under the provisions of Chapter 177 of the Public Laws of 1909, entitled "An Act relating to the Common School Fund and the means of providing for and distributing the same." Bill dated July 27, 1910. An answer was filed by the defendant. By agreement the case was reported to the Law Court for determination.

The case is stated in the opinion.

*Louis C. Stearns, Taber D. Bailey, and Louis C. Stearns, Jr.,* for plaintiff.

*Warren C. Philbrook,* Attorney General, and *William R. Pattangall,* Attorney General, for defendant.

SITTING: WHITEHOUSE, C. J., SPEAR, CORNISH, KING, BIRD, HALEY, HANSON, JJ.

CORNISH, J. This bill in equity is brought to enjoin the Treasurer of State and his successors in office, from collecting a tax assessed under the provisions of Chapter 177 of the Public Laws of 1909, entitled, "An Act relating to the Common School Fund and the means of providing for and distributing the same." The plaintiff is a resident of Mattamiscontis, an unorganized township in the County of Penobscot. He is the owner of twelve lots of land in the township, and has one child of school age. The entire State tax assessed against these lots at the rate of five mills amounted to twenty-one dollars and fifty-one cents, three-tenths of which or six dollars and forty-five cents, was created by the act in

question. The amount involved in this suit is not large but the consequences are of vast importance.

The case comes up on report, and by stipulation, the only question raised and to be considered is the constitutionality of the chapter above referred to under the State and Federal Constitutions.

Chapter 177 of the Public Laws of 1909, the statute in question, reads as follows:

"Sec. 1. A tax of one and a half mills on a dollar shall annually be assessed upon all of the property in the state according to the valuation thereof and shall be known as the tax for the support of common schools.

"Sec. 2. This tax shall be assessed and collected in the same manner as other state taxes and shall be paid into the State Treasury and designated as the common school fund.

"Sec. 3. One third of this fund shall be distributed by the treasurer of state on the first day of January, annually, to the several cities, towns and plantations according to the number of scholars therein, as the same shall appear from the official returns made to the state superintendent of public schools for the preceding year, and the remaining two thirds of said fund shall be distributed by the treasurer of state on the first day of January, annually, to the several cities, towns and plantations, according to the valuation thereof as the same shall be fixed by the state assessors for the preceding year.

"Sec. 4. All of the said fund not distributed or expended during the financial year shall at its close be added to the permanent school fund.

"Sec. 5. All moneys provided by towns or apportioned by the state for the support of common schools shall be expended for the maintenance of common schools, established and controlled by the towns by which said moneys are provided, or to which said moneys are apportioned.

"Sec. 6. Sums received by any city, town or plantation from the distribution provided by section three shall be deemed to be raised by such city, town or plantation within the meaning of revised statutes, chapter fifteen, section thirteen, as amended.

"Sec. 7. The passage of this act shall in no wise affect the provisions of sections one hundred and twenty-four, one hundred and twenty-five, one hundred and twenty-six and one hundred and

twenty seven of chapter fifteen of the revised statutes, or of section two of chapter one hundred and eleven of the Public Laws of 1907."

It is contended that this statute violates section 8 of Article IX of the State Constitution, which reads: "All taxes upon real or personal estate assessed by authority of this State shall be apportioned and assessed equally according to the just value thereof;" Article VIII providing that "the Legislature are authorized and it shall be their duty to require the several towns to make suitable provision, at their own expense, for the support and maintenance of public schools" and the fourteenth amendment of the Federal Constitution, declaring that "No State shall deny to any person within its jurisdiction the equal protection of the laws."

Before entering upon a consideration of the constitutional questions thus raised, it may be useful to take a brief survey of the laws in force at the time this statute was enacted, pertaining to the raising and distribution of money for the common schools of the State.

These schools have received their support from two distinct sources, State aid and direct municipal taxation, the former passing through the State treasury to the treasuries of the several municipalities and the latter through the municipal treasuries alone. *State Aid.*

The State aid, since 1872, when the first so-called mill tax was created, has itself been derived from three sources.

First. From the income of the "Permanent School Fund" so called, a fund created by the sale of wild lands appropriated by the State in former years for the support of schools, amounting at the present time to about one-half a million dollars, and on this principal the State pays interest at the rate of six per cent. R. S., Ch. 15, Sec. 122.

Second. From one-half of the State tax on Savings Banks and Trust Companies, R. S., Ch. 15, Sec. 122.

Third. From the school mill tax so called, derived from assessing all the property in the State situated in cities, towns, plantations and unorganized townships, at the rate of one mill on the dollar from 1872 to 1907, and since 1907 at the rate of one and one-half mills. R. S., Ch. 15, Sec. 124, Pub. Laws 1907, Ch. 111.

This school mill fund is distributed by the Treasurer of State to the several cities, towns and plantations, according to the number of scholars therein.

The Legislature of 1909 created by the act in question, Chap. 177, an additional revenue by imposing a further State tax of one and one-half mills upon all of the property in the several cities, towns, plantations and unorganized townships of the State at the rate of one and one-half mills on the dollar, this fund to be known as the Common School Fund and to be distributed by the State Treasurer to the several cities, towns and plantations of the State, one-third according to the number of scholars therein and two-thirds according to the valuation. The support of common schools on the part of the State under the present plan is therefore derived from (1) the Permanent School Fund, (2) the Savings Bank and Trust Company tax, (3) the School and Mill Fund and (4) the Common School Fund. It is this last which is under consideration here.

*Municipal Aid.*

The several cities, towns and plantations have in addition been compelled by the Legislature to assist in the maintenance of common schools by municipal taxation. The amount thus required has varied from time to time. In 1821, it was fixed at forty cents per capita, inclusive of the income of any incorporated school fund, Stat. 1821, Ch. 117, Sec. 1; changed in 1832 to forty cents, exclusive of State income or of any State aid, Pub. Laws 1832, Ch. 39; sixty cents, exclusive, as in R. S. 1857, Ch. 11, Sec. 5; changed to one dollar, exclusive, by Pub. Laws 1868, Ch. 196; eighty cents exclusive of such income, State aid and of the mill tax, from 1872 to 1907, Pub. Laws 1872, Ch. 56, R. S. 1903, Ch. 15, Sec. 13; fifty-five cents, exclusive from 1907 to 1909, Pub. Laws 1907, Chap. 111; and since January 1, 1910, eighty cents "exclusive of the income of any corporate school fund, or of any grant from the revenue or fund from the State or of any voluntary donation, devise or bequest," Pub. Laws 1909, Chap. 128, but inclusive of any sums received from the distribution of the Common School Fund created by the act now under consideration. Pub. Laws 1909, Ch. 177, Sec. 6.

It is perhaps unnecessary to add that it has always been and still is within the power of the municipalities to voluntarily raise

by taxation such amounts in addition to the required per capita tax as they may deem necessary and proper. *Cushing* v. *Newburyport,* 10 Met., 508; *Piper* v. *Moulton,* 72 Maine, 155-166.

Let us now take up the constitutional questions involved in this case and consider what the plaintiff deems the vulnerable points in the act in question. We will discuss them seriatim.

It is not contended that the manner in which this tax is assessed violates any constitutional provision. Section 8 of Art. IX of the State Constitution requires that "All taxes upon real or personal estate, assessed by authority of this State shall be apportioned and assessed equally according to the just value thereof." The act under consideration meets this requirement fully. The assessment is laid upon all the property both real and personal throughout the State, in all the cities, towns, plantations and unorganized townships. No property escapes. No locality escapes. All the property is assessed by the State Board of Assessors at its just valuation and a uniform rate of taxation, one and one-half mills, is laid upon all classes of property. No such objection can be raised to the mode of assessment here as in the statute considered in the Opinion of Justices, 97 Maine, 595, where a discrimination was made between land in incorporated and in unincorporated places. Here there is no discrimination. The apportionment and assessment are equal throughout the State.

Objections, however, are raised to the manner of distribution, and the plaintiff contends that in considering the constitutionality of a statute creating revenue by taxation, the method of distribution as well as of assessment should be scrutinized.

1. The first objection is that this act imposes an unequal burden of taxation upon the unorganized townships of the State, because while the fund is created by the taxation of all the property in such townships as well as upon the property in the cities, towns and plantations, no provision is made for the distribution of any part thereof to such townships, but it is all apportioned among the cities, towns and plantations. The townships are omitted. In other words, while four subdivisions of the State are made to contribute to the fund, only three are permitted to share in the financial benefits.

This objection, however, is without legal foundation. The Legislature has the right under the constitution to impose an equal rate

of taxation upon all the property in the State, including the property
in unorganized townships, for the purpose of distributing the pro-
ceeds thereof among the cities, towns and plantations for common
school purposes, and the mere fact that the tax is assessed upon the
property in four municipal subdivisions and distributed among
three, is not in itself fatal.

Doubt arose as to the constitutionality of the original School
Mill Act, Ch. 43, of the Public Laws of 1872, which was the first
in this State to impose a general tax upon all the property in the
State and devote the proceeds to the maintenance of the common
schools. Accordingly in 1876, the House of Representatives asked
the Justices of the Supreme Judicial Court whether the Legislature
has the power under the Constitution of the State to assess a gen-
eral tax upon the property of the entire State, for the purposes of
distribution for the support of the common schools. The Justices
answered unanimously in the affirmative. Opinions of the Justices,
68 Maine, 582.

Ample ground for the exercise of this legislative power was
found in the constitutional provision that "A general diffusion of
the advantages of education are essential to the preservation of the
rights and liberties' of the people," Art. VIII, and in the "full
power" conferred upon the Legislature "to make and establish all
reasonable laws and regulations for the defense and benefit of the
people of this State," Art. IV, part 3, Sec. 1. The existence of the
power being granted, of the necessity of its exercise, the Legisla-
ture must be and is the sole judge. The broad ground upon which
the validity of the act was upheld is stated in these words: "The
tax in question is like that for the support of government. It is
for the benefit of the whole people. All the property in the State is
assessed according to its valuation. All contribute thereto in pro-
portion to their means. It is a tax for a public purpose, not one by
which one individual is taxed for the special and peculiar benefit of
another. All enjoy the beneficial results of education, and the
better order and government arising therefrom, irrespective of the
amounts respectively contributed by each to these most important
objects." While it is true that the opinions of Justices given at the
request of either Branch of the Legislature or of the Executive,
do not have the binding force of decisions in adjudicated cases,

(95 Maine, 566, 573) yet they carry weight in proportion to the reasons upon which they are based.

The Justices in considering the mill tax did not in detail discuss the discrimination against unorganized townships, which share in the contribution but not in the distribution, but that question was necessarily involved in their opinion, because in this respect the Acts of 1872 and of 1909 are identical, and the language quoted above meets and answers it fully. The fundamental question is this, is the purpose for which the tax is assessed a public purpose, not whether any portion of it may find its way back again to the pocket of the tax payer or to the direct advantage of himself or family. Were the latter the test, the childless man would be exempt from the support of schools and the sane and well from the support of hospitals. In order that taxation may be equal and uniform in the constitutional sense, it is not necessary that the benefits arising therefrom should be enjoyed by all the people in equal degree nor that each one of the people should participate in each particular benefit. Laws must be general in their character and the benefits must affect different people differently. This is due to difference in situation. As was said in the State Railroad Tax Cases, 92 U. S., 575-612, "perfect equality and perfect uniformity of taxation as regards individuals or corporations, or the different classes of property subject to taxation is a dream unrealized." But the law recognizes a broader and more unselfish test than this. In a Republic like ours each must contribute for the common good, and the benefits are received not directly in dollars and cents, but indirectly in a wider diffusion of knowledge, in better homes, saner laws, more efficient administration of justice, higher social order and deeper civic righteousness.

This is the legal and constitutional answer to the plaintiff's claim of inequality but in this connection it should not be overlooked that the Legislature has in fact made wise and generous provision for the education of children in the unorganized townships, more generous in fact than in the case of children in incorporated places. The very fact that these townships have no municipal organization precludes a distribution to them of any share in the school fund by the same method that distribution is made to cities, towns and plantations. The municipal machinery therefor, is lacking. Accordingly by R. S., Ch. 15, Section 94, as amended by Chap. 87 of the

Laws of 1909, the State either maintains a school for twenty-six weeks in the year in every unorganized township in which there is more than one child of school age, or provides for sending the children to schools in adjoining towns or plantations, on condition that the inhabitants of the township pay to the State, a sum equal to forty cents for each inhabitant. The expense of educating the children in such townships in excess of the per capita tax of forty cents and of the interest on the reserve school fund in the township, is all borne by the State by appropriations from the annual school funds of the State, which include the mill tax fund and the common school fund.

And these appropriations from the annual school funds for use in the township schools have increased as the State funds for school purposes have increased. In 1899 it was $1500, Pub. L. 1899, Ch. 89, increased to $2500 by Pub. L. 1901, Ch. 206, to $5000 by Pub. L. 1903, Ch. 128, to $7000 by Pub. L. 1905, Ch. 45, to $15,000 by Pub. L. 1909, Ch. 87, and to $18,000 by Pub. L. 1911, Ch. 29.

So that when the Legislature of 1909 by the enactment of Chap. 117, practically increased the State tax for school purposes from one and one-half mills to three mills, and doubled the rate on these unorganized townships, it, at the same session by Chap. 87, increased the appropriation for the township schools from $7000 to $15,000, a little more than the same ratio of increase would require. It might be added that each of the three school children in the township of Mattamiscontis in the year ending April 1, 1911, received an expenditure of $53.58 and each scholar on the average in all the unorganized townships of the State received $19.00 for school purposes while the amount per scholar throughout the State averaged only $2.52. The 948 children of school age in the unorganized townships received on the average about eight times as much as the 214,960 children in the cities, towns and plantations.

In this view of the situation it is evident that the passage of the common school fund act of 1909 in fact works neither inequality nor injustice so far as the education of children in the unorganized townships is concerned, and when the Legislature doubled the amount of the school tax which the land of the plaintiff was to pay, it at the same time more than doubled the proportional part of the State fund which could be used for the education of his children.

So much for the first contention as to inequality between taxes paid and benefits received.

2. But the plaintiff further attacks the method of distribution as unconstitutional because it is made, not according to the number of scholars, as is the school mill fund, but one-third according to the number of scholars and two-thirds according to valuation, thus benefiting the cities, and richer towns more than the poorer.

But that result, is not the test of constitutionality. Inequality of assessment is necessarily fatal, inequality of distribution is not, provided the purpose be the public welfare. The method of distributing the proceeds of such a tax rests in the wise discretion and sound judgment, of the Legislature. If this discretion is unwisely exercised, the remedy is with the people and not with the court. Such distribution might be according to population, or according to the number of scholars of school age, or according to school attendance, or according to valuation, or partly on one basis and partly on another. The Constitution prescribes no regulation in regard to this matter and it is not for the court to say that one method should be adopted in preference to another. We are not to substitute our judgment for that of a coördinate branch of the government working within its constitutional limits. The distribution of the school mill fund of 1872 has resulted in inequality. That distribution has been, and continues to be, based on the number of scholars, thereby benefiting the poorer towns more than the richer, because they receive more than they pay, and in the opinion of the Justices before cited, that method is deemed constitutional. The act under consideration apportions the newly created common school fund one-third according to the number of scholars and two-thirds according to the valuation as fixed by the State Assessors, thereby benefiting the richer towns more than the poorer, producing inequality in the other direction, but we are unable to see why this method is not equally constitutional with the other. Both taxes are assessed for the same admittedly public purpose, both promote the common welfare, and the fact that the Legislature has seen fit to distribute the two on different bases is not fatal to the validity of either. It may be that the two methods taken together produce a more equal distribution than either operating alone. In any event, the Legislature has adopted both methods and both must stand or fall together.

3. Nor is there any force in the contention that because the town receives back from the State practically two-thirds of what it has paid to the State, therefore it can relieve itself from local taxation for other purposes than schools, and can devote the proceeds, when received, to the support of paupers, or the maintenance of roads or the running expenses of the town, thereby making the unorganized townships contribute towards these local charges. This is a groundless fear. The very terms of the act prohibit it. Section 5 provides that "all moneys provided by towns or apportioned by the State for the support of common schools, shall be expended for the maintenance of common schools, established and controlled by the towns by which said moneys are provided or to which said moneys are apportioned." It is not for the court to say that this express and mandatory clause will be deliberately nullified or evaded by the towns. This money is raised for a particular purpose, collected by the State for that purpose, paid over to the towns for that purpose with a specific injunction that it shall be used for that and nothing else. Who has the right to say that that injunction will be violated?

4. But the constitutionality of this act is assailed on another ground and that is that Section 6 permits sums received from the State under this distribution "to be deemed to be raised by the municipalities within the meaning of R. S., Ch. 15, Sec. 13, as amended," thereby relieving them pro tanto from raising by municipal taxation for school purposes the not less than eighty cents for each inhabitant required by R. S., Ch. 15, Sec. 13, as amended by Pub. Laws of 1900, Ch. 128.

In this respect this common school fund act of 1909, differs from the school mill act of 1872. The act of 1872 does not afford such relief because the towns are still required to raise their eighty cents per capita tax, and the amount received by the towns from the mill fund is additional thereto. But the act of 1909 permits the amounts apportioned thereunder by the State to the several towns to be applied towards the per capita tax, so that under this act some towns are wholly and others partially relieved from such local taxation. This, it is claimed, contravenes Art. VIII of the State Constitution which reads:

"A general diffusion of the advantages of education being essential to the preservation of the rights and liberties of the people,

to promote this important object, the Legislature are authorized and it shall be their duty to require the several towns to make suitable provision, at their own expense, for the support and maintenance of the public schools," etc.

What is the fair construction of this clause? What force has it as a part of the organic law of the State?

It is but the restatement of a fundamental and familiar principle to say that the sovereign power is lodged in the people and that the Constitution, framed and adopted by the people, divides the powers of government into three distinct and yet coördinate departments, executive, judicial and legislative. But it is not always borne in mind that the Constitution operates differently with respect to these different branches. The authority of the executive and judicial departments is a grant. These departments can exercise only the powers enumerated in and conferred upon them by the Constitution and such as are necessarily implied therefrom. The powers of the Legislature in matters of legislation, broadly speaking are absolute, except as restricted and limited by the Constitution. As to the executive, and judiciary, the Constitution measures the extent of their authority, as to the Legislature it measures the limitations upon its authority. *Field* v. *The People,* 2 Scam. (Ill.), 79-81; Cooley, Const. Lim. 6th Ed. p. 104 and cases cited.

"It has never been questioned, so far as I know, says Redfield, C. J., in *Thorpe* v. *R. R. Co.,* 27 Vt., 140, "that the American Legislatures have the same unlimited power in regard to legislation which resides in the British Parliament, except where they are restrained by written Constitutions. This must be conceded, I think to be a fundamental principle in the political organizations of the American states. We cannot well comprehend how, upon principle, it should be otherwise. The people must of course possess all legislative power originally. They have committed this in the most general and unlimited manner to the several State legislatures, saving only such restrictions as are imposed by the Constitution of the United States or of the particular State in question."

It follows therefore that a legislative act is to be held constitutional unless a positive restriction or limitation or prohibition can be found in the Constitution which renders it invalid. No such limitation or prohibition in regard to the maintenance of the common schools can be found. The argument for unconstitutionality

on this ground is this, that Art. VIII, before referred to makes it
the duty of the Legislature to require the several towns to raise a
suitable sum by local taxation for the support of common schools;
that acting under that provision, the Legislature from the organiza-
tion of the State to the present time has fixed the amount at a per
capita rate, varying at different times between forty cents and one
dollar as we have before seen, that the practical effect of this act
under consideration is to relieve some towns altogether from such
local taxation and therefore to pro tanto repeal R. S., Ch. 15, Sec. 13,
and to nullify the constitutional provision. The mathematical result
claimed undoubtedly exists. According to the annual report of the
State Superintendent of Schools, fourteen of the cities, towns and
plantations in this State in the year ending April 1, 1911, raised
nothing locally under the 80c. per capita statute, the amount received
from the State being sufficient to meet the amount so required of
them and it being "deemed to be raised" under Chap. 15, Sec. 13,
they avoided the local taxation completely. From the same report
it appears that other towns profited so largely by the act that the
per capita assessment was reduced from eighty cents to a very
small figure, so that of the total amount of $1,184,439.60 required
to be raised by all the cities, towns and plantations, under R. S.,
Ch. 15, Sec. 13, $542,802 was in fact raised by local taxation, and
$642,378.69, or more than one-half, was contributed by the State
under Chap. 177 of the Laws of 1899. The practical effect is
undoubtedly as contended, and this result may well arrest the atten-
tion of the Legislature upon whom rests the responsibility.

But no limitation or prohibition of the Constitution has been
violated. Art. VIII "is mandatory not prohibitory." 68 Maine, 583.
It imposes the most solemn duties upon the Legislature and for
obvious reasons. No subject was dearer to the hearts of the
framers of our Constitution than that of education, recognizing as
they did that it lies at the very foundation of good government.
It was for that reason that they inserted this provision in the
organic law of the State. They in terms expressed the broad and
full powers which should be exercised in dealing with this subject
and sought to impress upon the Legislature its high duty to avail
itself of these powers. Not only could the Legislature enact laws
providing for a general assessment under the public benefit clause,
but in order that the towns, which were always jealous of their

rights, might assist, the power was lodged with the Legislature to require the towns to make suitable provision at their own expense. It is an historical fact that in the early days the towns had frequently neglected to make such provision and therefore the framers of the Constitution left no room to doubt that the Legislature should have the power to require them to do their duty to the end that the children and youth of the 'State should be properly educated. But the provision is nothing more than mandatory. "It shall be the duty of the Legislature to require the towns to make suitable provision." Suppose after the Constitution was adopted the Legislature had failed to pass any such act, what would be the remedy? None certainly in the court. It might be deemed a failure of duty but the court could not correct it. "The Legislature is in duty bound to perform all duties imposed upon it by the Constitution, but if it fails to do so and neglects or refuses to pass legislation as required by a mandatory constitutional provision, there is no remedy." 8 Cyc. Const. Law, p. 762, In re State Census, 6 So. Dak., 540, 62 N. W., 129. "The 15th section of the schedule to the Constitution declares, that 'the General Assembly shall pass all such laws as may be necessary to carry this Constitution into full effect.' There is no way of enforcing this injunction on the Legislature. Under our system of government there is no power to compel the legislative department of government to make laws. Constitutions may restrict legislative powers, and declare what laws shall not be valid; but, from the very nature of legislative power, its exercise in a particular case must depend upon the volition of the Legislature. Responsibility to a constituency, and a sense of public duty, are the only incentives which can prompt legislative action." *St. Jos. Board* v. *Patten*, 62 Mo., 444-448.

The Constitution of Alabama adopted in 1819 declared that the "general assembly shall direct, by law, in what manner and in what courts, suits may be brought against the State." In accordance with that provision, statutes were enacted in 1820 and from time to time amended prescribing the courts and the mode of procedure. In 1865 the Constitution was amended to read, "Suits may be brought against the State in such courts as may by law be provided." It was held in Ex parte Alabama, 52 Ala., 231, 23 Am. Rep., 567, that the subsequent repeal of these statutes was constitutional and abated pending suits.

A case on all fours with that at bar is *Adams* v. *Howe,* 14 Mass., 340. In the Massachusetts Declaration of Rights it was declared "that the people have a right to invest their Legislatures with power to authorize and require, and the Legislature shall, from time to time authorize and require the several towns, parishes, precincts and other bodies corporate and politic and religious societies to make suitable provision at their own expense for the institution of the public worship of God and for the support and maintenance of public protestant teachers of piety, religion and morality in all cases where such provision shall not be made voluntarily." Provisions for ministerial and parish taxes were subsequently made by the Legislature in accordance with this mandate of the Constitution. But in 1811, what was afterwards known as the Religious Freedom act was passed whereby any person was exempted from the payment of a ministerial tax by filing with the proper town officers a certificate of membership in another society. The Constitutionality of this statute was attacked on the ground that its effect was to pro tanto repeal the statutes imposing ministerial taxes and therefore that it controverted the provision in the Declaration of Rights above quoted. Chief Justice Parker in delivering the opinion of the court answered this contention as follows: "That part of the declaration which enjoins it upon the Legislature to exact the support of religious institutions and attendance upon public worship is merely directory. If no law had been passed pursuant to it, there could be no penalty upon the citizen, for not obeying the clear expression of the public will; nor is there any way of coercing a Legislature, to carry into effect these important requisitions. So the mode also, of executing the will of the people, in this particular, is left entirely to the Legislature; and although laws may be passed, which have a contrary tendency, and which, in their consequences, may injure, instead of promoting, the public worship; yet the Legislature is to judge; and even their erroneous construction of the design of the people, as expressed in the said declaration, must have legal effect, so far as they are not manifestly repugnant to the principles of the Constitution."

The phrasing of Art. VIII in the Constitution of Maine seems almost to have been copied from this clause in the constitution of the mother state and the authority of this decision is the greater because rendered at a time (1817) not long after the Constitution

of Massachusetts had been adopted. It may with propriety be deemed the construction placed upon it by contemporaries. This act of 1811 came again under discussion by the Massachusetts Court in *Holbrook* v. *Holbrook,* 1 Pick., 248, and in the course of the opinion Judge Wilde says: "No such exemption seems to have been contemplated by the framers of the Constitution, who manifestly intended that every one should be held to contribute according to his ability to the support of public worship, upon the institution and maintenance of which the happiness of the people, and the good order and preservation of civil government so essentially depend. But there being no restraining clause in the Constitution, the Legislature in the plenitude of their power have in the second section provided for this exemption; and as it seems, on the condition only, that the person claiming it shall become a member of some religious society, and shall produce a certificate of his membership to be filed with the town clerk. This religious society may be composed of Christians, or of Jews, Mahometans, or Pagans. It is not required to support any teacher of piety, religion and morality; and the person claiming exemption is not obliged to attend public worship as the condition of this privilege."

The phraseology of Section VIII is in itself significant. In the first place only a "duty" is laid upon the Legislature. The Constitution does not even say that they shall require, but that they are "authorized" and it is "their duty to require" the several towns to provide for the support of common schools.

And in the second place the extent of the requirement is left wholly to the discretion of the Legislature, because their duty is to require the several towns to make "suitable" provision. Who is to determine what is suitable? Clearly the Legislature itself. "Suitable" is an elastic and varying term, dependent upon the necessities of changing times. What the Legislature might deem to be suitable and therefore necessary under some conditions, they might deem unnecessary under others. The amount which the towns ought to raise would depend largely upon the amounts available to them from other sources, and as these other sources increase the local sources can properly diminish.

Most significant too, in this connection is the fact that the first act passed by the Legislature in furtherance of the constitutional injunction, fixed the municipal tax as "a sum of money, *including*

the income of any incorporated school fund, not less than forty cents for each inhabitant." Stat. 1821, Ch. 117, Sec. 1.   Under that Act, whatever was received from the income of any incorporated school fund was in effect "deemed to be raised" under that statute and reduced the amount required to be raised locally, and if such income were sufficient in any town to equal the per capita tax of forty cents, then the requirement for local taxation in that town ceased entirely.   In this most important particular the act of 1821 and of 1909 are identical.

In the light therefore, of these decisions and in view of the language of the Constitution and of the first legislative act passed in accordance therewith, we have no hesitation in saying that although the Act of 1909 may relieve a few towns (at present only fourteen out of a total of about five hundred) from any local taxation whatever for public schools, that is a matter which may be considered by the Legislature in the performance of their duty but does not of itself, in the absence of any restrictive constitutional provision, render the act unconstitutional and void.

We have not overlooked a statement in the opinion of the Justices, 68 Maine, 583, that Art. VIII "is affirmative and not negative in its character.   It, (the Legislature,) cannot constitutionally absolve the towns from making at their own expense suitable provision for this primary and indispensable foundation of all good government.   The Legislature are by proper enactments to require the towns to make suitable provisions for the public schools and the towns are, at their own expense, to comply with those enactments.   Neither can escape from the performance of their several and respective obligations."   The question then before the court was the power of the Legislature to supplement local taxation by general taxation for this public purpose, and the precise question of the force of the constitutional mandate was not involved. We do not feel that the conclusions reached in this decision after mature deliberation should be modified because of these expressions in the opinions of the Justices which are in the nature of dicta in an unadjudicated case.

5.   Another result of the application of the common school fund to the local tax is that all the towns are not now obliged to raise a uniform amount per capita, but it varies all the way along the line, from nothing up to eighty cents.   In other words, the legis-

lative requirement operates differently in different towns and the inevitable result is to create automatically as it were, a varying and un-uniform rate in the various cities and towns of the State.

But the Legislature has this power. Towns are mere agencies of the State. They are purely creatures of the Legislature and their powers and duties are within its control. *Howe* v. *Water Co.,* 104 Maine, 225. Hence it lies in the power of the Legislature not merely to pass laws applicable to all towns but it may direct its attention to the need of a particular town and compel such town to raise money by taxation, provided the purpose be a public one, and the tax be apportioned and assessed equally within that town, and the town receive the benefit thereof.

For instance the Legislature has control of the highways and bridges of the State and it has the power to reach out and compel one or more towns to construct a certain piece of road or erect a certain bridge and require such town or towns to assess the property therein for the expense. *Waterville* v. *Co. Coms.,* 59 Maine, 80; Opinions of the Justices, 99 Maine, 515. This is clearly implied in the decision of *Dyer* v. *Farmington, VIII. Corp.,* 70 Maine, 515, where the reason that a tax assessed for a public purpose could not be held constitutional was that it was imposed upon only a portion of the real estate of a town leaving the remainder exempt.

In *State* v. *Board of Co. Coms.* of Shawnee Co., 28 Kans., 431, the question involved was the right of the Legislature to establish a State road and cast the cost thereof upon the county through which the road lay and that too without submitting the matter to the determination of the county commissioners or the people of the county. That learned jurist, Justice Brewer, then of the Supreme Court of Kansas, sustained the constitutionality of the act and after holding the purpose to be a public one defined the legislative power in these words: "And finally we remark that counties are purely the creation of State authority. They are political organizations, whose powers and duties are within the control of the Legislature. That body defines the limits of their power, and prescribes what they must and what they must not do. It may prescribe the amount of taxes which each shall levy, and to what public purpose each shall devote the moneys thus obtained. It may require one county to build a certain number of bridges at certain specified places, and of a particular size and quality. It may

require another to open roads in given localities, and another to build a court house and to levy a tax to a prescribed amount for the purpose of paying therefor. In short, as a general proposition, all the powers and duties of a county are subject to legislative control; and provided the purpose be a public one and a special benefit to the county it may direct the appropriation of the county funds therefor in such manner and to such amount as it shall deem best."

Following the same reasoning the same court in *Kansas* v. *Freeman,* 61 Kans., 90, 47 L. R. A., 67, declared constitutional a legislative act establishing a high school at Howard, Elk County, and requiring its maintenance by the people of the county. The court say: "If the obligations which the municipalities are required to assume and discharge are for institutions and necessities of purely public concern, and for which taxes may ordinarily be levied, the power of the Legislature in respect to them is supreme, and its determination, if reached by constitutional methods, is not subject to review. The matter of establishing schools is certainly a public purpose, and the case at bar falls within the cited case, with which decision we are entirely satisfied." Other cases in point are *Gordon* v. *Cornes,* 47 N. Y., 608, where a single town was compelled to raise taxes for the erection of school buildings for a State Normal School; *Merrick* v. *Amherst,* 12 Allen, 500, where the Supreme Court of Massachusetts held that the Legislature had power to pass a statute authorizing a town to raise money for an Agricultural College to be established therein by the commonwealth; *Hanscom* v. *Lowell,* 165 Mass., 419, where an act establishing a textile school in the city of Lowell was held constitutional on the same ground. The last case affords an excellent illustration of the exercise of this power. In large manufacturing centers like Lowell, the Legislature may deem a textile school a necessity. It therefore directs Lowell to maintain such a school by local taxation. In another city it may deem a night school necessary. If so, it has the power to require that city to maintain one. See also, as to the extent of the powers of the Legislature in directing the assessment of taxes for public purposes, Cooley on Taxation, 2nd Ed. p. 119, *Cushing* v. *Inhs. of Newburyport,* 10 Met., 511, *Freeland* v. *Hastings,* 10 Allen, 570, *Prince* v. *Crocker,*

166 Mass., 347, *School Dist.* v. *Prentiss,* 66 N. H., 145, *Call* v. *Chadbourne,* 46 Maine, 206.

It should be added that in all these states, whose decisions have been cited, the Legislature had no broader powers under their respective Constitutions than has our Legislature under the Constitution of Maine.

The power to impose a burden upon a particular town for a public purpose thus residing in the Legislature, the provisions of Sec. 8 of Art. IX of the Constitution as to equality of apportionment and assessment is fully complied with in the levy under consideration, because all the property in the particular town is assessed at a uniform rate for the support of the schools of that town, and the schools of that town receive all the benefits therefrom. So long as all the property in town A is assessed at the same rate for the maintenance of schools in town A, and all the property in town B, for the maintenance of schools in town B, the provision of the Constitution as to equality of taxation is not violated even though the local rate prescribed by the Legislature in town A differs from that prescribed in town B.

6. Finally, does this act violate the Fourteenth amendment of the Federal Constitution, which declares "Nor shall any State deny any person within its jurisdiction the equal protection of the laws?" A single word is sufficient on this branch of the case. The object of this amendment is to prohibit discriminatory legislation, as the hawkers and peddlers license law, Ch. 298 of the Pub. Laws of 1889, *State* v. *Montgomery,* 94 Maine, 192, Same, Ch. 277 of Pub. Laws of 1901, *State* v. *Mitchell,* 97 Maine, 66. But if all persons subjected to the law in question are treated alike, under like circumstances and conditions both in the privileges conferred and in the liabilities imposed, there is no violation of this amendment. *Leavitt* v. *Ry. Co.,* 90 Maine, 153; *State* v. *Leavitt,* 105 Maine, 76. "The provision in the fourteenth amendment that no state shall deny to any person within its jurisdiction the equal protection of the laws was not intended to prevent a state from adjusting its system of taxation in all proper and reasonable ways." *Bells Gap R. R.* v. *Pennsylvania,* 134 U. S., 232.

Our conclusion therefore is that Chap. 177 of the Pub. Laws of 1909, violates neither the State nor the Federal Constitution, and the entry must therefore be,

*Bill dismissed with costs.*