**Linda McINNIS, a minor, etc., et al.,**
**Plaintiffs,**

v.

**Samuel H. SHAPIRO, Governor of the State of Illinois, Ray Page, Superintendent of Public Instruction of the State of Illinois, Adlai E. Stevenson, III, Treasurer of the State of Illinois, Michael J. Howlett, Auditor of the State of Illinois, Defendants.**

No. 68 C 673.

United States District Court
N. D. Illinois,
Eastern Division.

Nov. 15, 1968.

Judgment Affirmed March 24, 1969.
See 89 S.Ct. 1197.

Cecil C. Butler, Edward G. Thomson, Stanley A. Bass and Zane M. Cohn, Community Legal Counsel, and Curtis Heaston and Leo Holt, Cook County Legal Assistance Foundation, Inc., Chicago, Ill., for plaintiffs.

William G. Clark, Atty. Gen., and Thomas E. Brannigan and Peter C. Alexander, Asst. Attys. Gen., Chicago, Ill., for defendants.

Harry S. Miller, Chicago, Ill., for amici curiae.

Before HASTINGS, Circuit Judge, and DECKER and MAROVITZ, District Judges.

DECKER, District Judge.

This is a suit filed by a number of high school and elementary school students attending school within four school districts of Cook County, Illinois, on behalf of themselves and all others similarly situated challenging the constitutionality of

various state statutes dealing with the financing of the public school system.[1]

Plaintiffs claim that these statutes[2] violate their fourteenth amendment rights to equal protection and due process because they permit wide variations in the expenditures per student from district to district, thereby providing some students with a good education and depriving others, who have equal or greater educational need. Plaintiffs claim to be members of this disadvantaged group.

To correct this inequitable situation, they seek a declaration that the statutes are unconstitutional and a permanent injunction forbidding further distribution of tax funds in reliance on these laws.

The defendants are state officials charged with the administration of the legislation which allegedly permits this discrimination.

A three-judge district court was convened pursuant to 28 U.S.C. §§ 2281 and 2284. Defendants then moved to dismiss the complaint (1) for lack of jurisdiction and (2) for failure to state a cause of action.

■ We conclude that we have jurisdiction. After examining the complaint, and studying the extensive briefs filed by the respective parties as well as the brief of the amici curiae,[3] we further conclude that no cause of action is stated for two principal reasons: (1) the Fourteenth Amendment does not require that public school expenditures be made only on the basis of pupils' educational needs,[4] and (2) the lack of judicially manageable standards makes this controversy nonjusticiable. After explaining the structure of the existing Illinois legislation, this opinion will discuss these two conclusions in detail.

*I. Jurisdiction*

■ The federal courts have jurisdiction over the subject matter of this controversy. As stated in Baker v. Carr, 369 U.S. 186, 200, 82 S.Ct. 691, 701, 7 L. Ed.2d 663 (1962):

"Since the complaint plainly sets forth a case arising under the Constitution, the subject matter is within the federal judicial power defined in Art. III, § 2, and so within the power of Congress to assign to the jurisdiction of the District Courts."[5]

Similarly, the allegations do not present a political question because there is no potential conflict between coordinate branches of the federal government.[6]

---

1. There is also a corporate plaintiff, Concerned Parents and People of the West Side, which was organized to improve the quality of educational facilities available to the citizens of an area within Chicago popularly known as "Lawndale."

2. Specifically, the students challenge the following parts of 1967 Ill.Rev.Stat. ch. 122: §§ 11–1, 11–6, 11–9, 18–1 through 18–4, 18–8 through 18–14, 29–5, 34–22 through 34–29, and 34–42 through 34–82. also questioned are ch. 122, articles 17, 19, and 32, and ch. 85 §§ 851 through 851.5d

3. The following five organizations filed a brief in support of the complaint as amici curiae: American Jewish Congress, League of Women Voters of Illinois, South Suburban Human Relations Council, National Association of Social Workers, and Inter-Community Programs, Inc.

4. While the complaining students repeatedly emphasize the importance of pupils' "educational needs," they do not offer a definition of this nebulous concept. Presumably, "educational need" is a conclusory term, reflecting the interaction of several factors such as the quality of teachers, the students' potential, prior education, environmental and parental upbringing, and the school's physical plant. Evaluation of these variables necessarily requires detailed research and study, with concomitant decentralization so each school and pupil may be individually evaluated. See pages 333 and 335, infra.

5. See also Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946); Colegrove v. Green, 328 U.S. 549, 66 S.Ct. 1198, 90 L.Ed. 1432 (1946).

6. "[I]t is the relationship between the judiciary and the coordinate branches of the Federal Government, and not the federal judiciary's relationship to the States, which gives rise to the 'political question.'" 369 U.S. 210, 82 S.Ct. 706. See

Both the equal protection and the due process clauses have long been used to scrutinize state legislative action. See, e. g., Williamson v. Lee Optical of Oklahoma, 348 U.S. 483, 488–489, 75 S.Ct. 461, 99 L.Ed. 563 (1955).[7]

## II. The Financing of Illinois' Public Schools

The General Assembly has delegated authority to local school districts to raise funds by levying a tax on all property within the district. In addition, the school districts may issue bonds for constructing and repairing their buildings. Legislation limits both the maximum indebtedness and the maximum tax rate which localities may impose for educational purposes. In 1966–67, the approximately 1300 districts had roughly $840 per pupil with which to educate their students, of which about 75% came from local sources, 20% was derived from state aid, and 5% was supplied by the federal government. Since the financial ability of the individual districts varies substantially, per pupil expenditures vary between $480 and $1,000. State statutes which permit such wide variations allegedly deny the less fortunate Illinois students of their Constitutional rights.

Article VIII, section 1 of the Illinois Constitution, S.H.A. requires the legislature to "provide a thorough and efficient system of free schools, whereby all children of this state may receive a good common school education." Accordingly, a state common school fund supplements each district's local property tax revenues, guaranteeing a foundation level of $400 per student. The common school fund has two main components: (1) a flat grant to districts for each pupil, and (2) an equalization grant awarded to each district which levies a minimum property tax rate.[8] The equalization grant is calculated on the assumption that the district only assesses the minimum rate. Total revenues from the state common school fund account for about 15%—18% of all districts' income.

The local tax revenue per student which is necessarily generated by the preceding minimum rate[9] is added to the flat grant per pupil. If this sum is less than $400, the difference is the equalization grant. Therefore, every district levying the minimum rate is assured of at least $400 per child. On the other hand, if a locality desires to tax itself more heavily than the minimum rate, it is not penalized by having the additional revenue considered before determination of the equalization grant. Since the hypothetical calculation uses the same tax rate for all localities, the assumed revenue per child depends upon the total assessed property value in a district and the number of students. Thus, the equalization grant tends to compensate for variations in property value per pupil from one district to another.

Finally, numerous special programs, both state and federal, supply about 10% of the districts' revenues. This "categorical aid" is allocated for particular purposes such as bus transportation or assistance to handicapped and disadvantaged children. Plaintiffs do not challenge these programs, conceding that they are rationally related to the educational needs of the students.[10]

---

also Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960). But see Coleman v. Miller, 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939).

7. See also Allied Stores of Ohio, Inc. v. Bowers, 358 U.S. 522, 79 S.Ct. 437, 3 L.Ed.2d 480 (1959); Brown-Forman Co. v. Commonwealth of Kentucky, 217 U.S. 563, 30 S.Ct. 578, 54 L.Ed. 883 (1910).

8. Over 97% of the districts qualify for the equalization grant. The flat grant, ac-counting for about one-third of the state aid, is now $47 per elementary student and $54.05 per high school pupil.

9. Specifically, the qualifying rate is multiplied by the average assessed property valuation per pupil to obtain a minimum income from local taxation.

10. For a more detailed description of Illinois' public school financing, see generally Task Force on Education, Education For The Future of Illinois, ch. VII (1966).

## III. The Fourteenth Amendment: Equal Protection and Due Process

The underlying rationale of the complaint is that *only* a financing system which apportions public funds according to the educational needs of the students satisfies the Fourteenth Amendment.[11] Plaintiffs assert that the distribution of school revenues to satisfy these needs should not be limited by such arbitrary factors as variations in local property values or differing tax rates.

Clearly, there are wide variations in the amount of money available for Illinois' school districts, both on a per pupil basis and in absolute terms. Presumably, students receiving a $1000 education are better educated that those acquiring a $600 schooling.[12] While the inequalities of the existing arrangement are readily apparent, the crucial question is whether it is unconstitutional. Since nearly three-quarters of the revenue comes from local property taxes, substantially equal revenue distribution would require revamping this method of taxation, with the result that districts with greater property values per student would help support the poorer districts.

## A. Social Policy

While the state common school fund tends to compensate for the variations in school districts' assessed valuation per pupil, variation in actual expenditures remains approximately 3.0 to 1, 2.6 to 1, and 1.7 to 1 for elementary, high school and unit districts respectively. Though districts with lower property valuations usually levy higher tax rates, there is a limit to the amount of money which they can raise, especially since they are limited by maximum indebtedness and tax rates. Plaintiffs argue that state statutes authorizing these wide variations in assessed value per student are irrational, thus violating the due process clause. Moreover, under the equal protection clause, the students contend that the importance of education to the welfare of individuals and the nation requires the courts to invalidate the legislation if potential, alternative statutes incorporating the desirable aspects of the present system can also achieve substantially equal per pupil expenditures.[13]

Illustrating how the school financing could be improved, plaintiffs suggest two alternatives:[14] (1) all students might

---

11. Although plaintiffs stress the alleged denial of equal protection, they seek relief resembling substantive due process. Surely, quality education for all is more desirable than uniform, mediocre instruction. Yet if the Constitution only commands that all children be treated equally, the latter result would satisfy the Fourteenth Amendment. Certainly, parents who cherish education are constitutionally allowed to spend more money on their children's schools, be it by private instruction or higher tax rates, than those who do not value education so highly. Thus, the students' goal is presumably a judicial pronouncement that each pupil is entitled to a minimum level of educational expenditures, which would be significantly higher than the existing $400.

12. These figures probably understate the national discrepancies. See, e. g., Levi, "The University, The Professions, and The Law—An Address," 56 Calif.L.Rev. 251, 258 (1968).
"The average current expend'tures in 1965 for the East South Central states was 354 dollars per pupil in the primary and secondary public schools. The com-

parable figure was 732 dollars in the Middle Atlantic states. * * * These discrepancies also occur * * * between suburbs surrounding a single city. For example, the expenditure per high school pupil in a suburb to the north of Chicago is 1,283 dollars; in a suburb to the south of the city it is 723 dollars. The expenditure per elementary school pupil in a northern suburb is 919 dollars; in a southern suburb it is 421 dollars." See also National Education Association, Rankings of The States, 1966, page 51 (1966).

13. Thus, the students advocate a doctrine similar to the close scrutiny given laws which infringe First Amendment rights. See, e. g., Kevishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); N.A.A.C.P. v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963).

14. Plaintiffs' suggestions arguably go no further than the upheavals recently created by bussing pupils and redrawing district boundaries in order to achieve racial balance. Except where localities at-

receive the same dollar appropriations, or (2) the state could siphon off all money in excess of $ × per pupil which was produced by a given tax rate, in effect eliminating variations in local property values while leaving the districts free to establish their own tax rate.[15]

■ Without doubt, the educational potential of each child should be cultivated to the utmost, and the poorer school districts should have more funds with which to improve their schools. But the allocation of public revenues is a basic policy decision more appropriately handled by a legislature than a court. To illustrate, the following considerations might be relevant to a financing scheme: state-wide variations in costs and salaries, the relative efficiency of school districts, and the need for local experimentation.

■■ As stated in Metropolitan Casualty Insurance Co. v. Brownell,[16] 294 U.S. 580, 584, 55 S.Ct. 538, 540, 79 L.Ed. 1070 (1935):

"[T]he burden of establishing the unconstitutionality of a statute rests on him who assails it * * * A statutory discrimination will not be set

aside as the denial of equal protection of the laws if any state of facts reasonably may be conceived to justify it."

And more recently, the Supreme Court declared that:

"[T]he Fourteenth Amendment permits the States a wide scope of discretion in enacting laws which affect some groups of citizens differently than others. The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective. State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality."

McGowan v. Maryland, 366 U.S. 420, 425–426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961).[17] See also Salsburg v. Maryland, 346 U.S. 545, 552–553, 74 S.Ct. 280, 98 L.Ed. 281 (1954).[18]

■ Tested by these standards, the existing school legislation is neither arbitrary nor does it constitute an invidious discrimination.[19] It therefore complies with the Fourteenth Amendment.

tempted to avoid Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L. Ed. 873 (1954), however, these changes were accomplished legislatively rather than judicially.

15. For example, if a district only levied a 1% tax rate, it could keep only $400 per pupil, regardless of the absolute dollars produced. On the other hand, the state would also guarantee $400 per pupil to units imposing the 1%. At higher rates, such as 4%, the state would thus substantially aid districts with low valuations, deriving most of its funds from wealthy districts which produced far more than $400 per pupil by a 1% rate.

16. In Metropolitan Co., the Court upheld a state regulatory statute which distinguished between domestic and foreign casualty insurance companies, finding that differences in the security and collection of claims against the two groups may have justified differential treatment.

17. Sunday laws were sustained even though First Amendment rights were involved and despite the availability of less oner-

ous alternatives for providing a day of rest and recreation.

18. "We do not sit as a superlegislature or a censor.

* * * * *

"We find little substance to appellant's claim that distinctions based on county areas are necessarily so unreasonable as to deprive him of the equal protection of the laws guaranteed by the Federal Constitution.

" * * * Territorial uniformity is not a constitutional requisite." 346 U.S. 550–552, 74 S.Ct. 283.

19. See also Allied Stores of Ohio v. Bowers, 358 U.S. 522, 527–528, 79 S.Ct. 437, 3 L.Ed.2d 480 (1959) (exemption of certain merchandise from state taxation upheld under the equal protection clause); Brown-Forman Co. v. Commonwealth of Kentucky, 217 U.S. 563, 573, 30 S.Ct. 578, 580, 54 L.Ed. 883 (1910): "If the selection or classification is neither capricious nor arbitrary, and rests upon some reasonable consideration of difference or policy, there is no denial of the equal protection of the law."

In the instant case, the General Assembly's delegation of authority to school districts appears designed to allow individual localities to determine their own tax burden according to the importance which they place upon public schools. Moreover, local citizens must select which municipal services they value most highly. While some communities might place heavy emphasis on schools, others may cherish police protection or improved roads. The state legislature's decision to allow local choice and experimentation is reasonable, especially since the common school fund assures a minimum of $400 per student.[20]

Plaintiffs stress the inequality inherent in having school funds partially determined by a pupil's place of residence, but this is an inevitable consequence of decentralization. The students also object to having revenues related to property values, apparently without realizing that the equalization grant effectively tempers variations in assessed value by using a hypothetical calculation. Furthermore, the flat grants and state and federal categorical aid reduce the school's dependence on local taxes. While alternative methods of distributing school monies might be superior to existing legislation,

"To be able to find fault with a law is not to demonstrate its invalidity. It may seem unjust and oppressive, yet be free from judicial interference. The problems of government are practical ones and may justify, if they do not require rough accommodations—illogical, it may be, and unscientific. * * * Mere errors of government are not subject to our judicial review. It is only its palpably arbitrary exercises which can be declared void under the Fourteenth Amendment."

Metropolis Theatre Co. v. City of Chicago, 228 U.S. 61, 69–70, 33 S.Ct. 441, 57 L.Ed. 730 (1913).[21]

Plaintiffs also attack numerous details of the present legislative scheme, such as the uniform maximum tax rate for both elementary and high schools. Allegedly, high schools need more money than elementary schools; but the answer is the increased number of students attending high schools may provide the additional funds. Also, plaintiffs complain that the maximum tax rate for the City of Chicago is about half that for the remaining school districts. Since the city is so much larger than other districts, however, distinctive legislation is appropriate to adjust for potential efficiencies.[22] The maximum tax rates which plaintiffs object to were enacted to avoid another disaster such as that which struck certain localities during the Great Depression; the possibility of similar economic crises supports the statutory ceilings.

20. While condemning the present distribution system, plaintiffs concede the virtue of decentralization, as follows:
"Decentralized administration and decision-making are desirable for administrative and political reasons. A division of the state into local school districts is therefore necessary. The voters in any particular area are best able to weigh convenience, the desired degree of homogeneity in the student body, and other factors. These voters are the best able to draw school district boundaries. Once these boundaries are drawn, the administrators or residents of the district, being closest to the problem, are best able to determine the educational needs of the district's children. That decision takes the form of support for a certain tax rate. Sometimes, this decentralized decision-making in creating districts or in adopting a tax rate will result in insufficient distribution of educational services. When that occurs the state in recognition of its ultimate responsibility provides sufficient funds to purchase 'basic' education for each child. Four hundred dollars per pupil is the figure necessary to support a 'basic' educational program. Of course, any disadvantage is outweighed by the values of decentraliized administration and decision-making."

21. Differential theatre license fees based on the price of admission, rather than on profit revenue, satisfied the equal protection clause.

22. See, e. g., Latham v. Board of Education, 31 Ill.2d 178, 184, 201 N.E.2d 111 (1964).

In each of the instances where particular statutory provisions have been criticized by plaintiffs we can find a legitimate legislative policy. Where differences do exist from district to district, they can be explained rationally. The charges made in the complaint fall short of demonstrating either an arbitrary exercise of legislative power or an invidious discrimination. Under these circumstances, there can be no denial of any Fourteenth Amendment rights.

Moreover, the legislature is constantly upgrading the quality of education. For example, the foundation level was recently revised from the 1965–66 level of $330 to the present $400. Also, the General Assembly has substantially consolidated the school districts, reducing the 11,955 which existed in 1945 to approximately 1,340 today. Recently a legislative study commission suggested that educational television be introduced in the schools and that the foundation level be raised to $435. See Report of the School Problems Commission No. 9, ch. I (1967); compare Report of School Problems Commission No. 7, p. 76–77 (1963).[23]

## B. Plaintiffs' Legal Precedent

The complaining students rely upon recent Supreme Court decisions in the fields of school desegregation,[24] voting rights[25] and criminal justice.[26] Specifically, they contend that "equal educational opportunity," however that term may be defined, is constitutionally compelled because (1) state discrimination in education may not be based on color, (2) the state may not employ arbitrary geographical lines to establish electoral units within local governments, and (3) wealth may not be used to differentiate among criminal defendants if such discrimination is adverse to the indigent.[27]

But the plaintiffs' conclusion does not follow so readily from the preceding building blocks. The decided cases established significant, but limited principles. To illustrate, Brown v. Board of Education was primarily a desegregation case. Although placed in the context of public schools, it does not undermine the validity of Illinois' public financing. Similarly, Hobsen v. Hansen, 269 F.Supp. 401 (D.D.C.1967), struck down variations in expenditures because the classifying factor was race.[28] The holding in Douglas v. California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963), derived primarily from its criminal justice setting, rather than the poverty of the defendant. Moreover, Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), strengthened citizens' voting rights because the Constitution specifically enfranchises all citizens equally, not as a

---

23. In addition, the Task Force on Education, sponsored in 1966 by then Governor Kerner and the legislature's School Problems Commission, recently proposed a plan of state financial support whereby each elementary student would receive a minimum of $600 and each high school student $750. Task Force on Education, Education For The Future of Illinois, p. 113, 135 (1966). Compare McLure, A Study of the Public Schools in Illinois (1965).

24. See, e.g., Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); Griffin v. County School Board, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964).

25. See, e.g., Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); Avery v. Midland County, 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968).

26. See, e.g., Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956); Douglas v. California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963); Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

27. See generally Kurland, "Equal Educational Opportunity: The Limits of Constitutional Jurisprudence Undefined," 35 U.Chi.L.Rev. 583, 586 (1968).

28. Of course, if plaintiffs alleged that Illinois' legislation was designed to avoid the Supreme Court's racial desegregation decisions, they would state a cause of action. See Griffin v. County School Board, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964).

result of general antipathy to historical geographical divisions.

Actually, there is little direct precedent because the contentions now presented are novel. But, the few relevant cases indicate that plaintiffs must resort to the legislature rather than the courts. The students are not deprived of their civil rights under 28 U.S.C. § 1343 because the asserted guarantee does not exist under the Constitution. LeBeauf v. State Board of Education, 244 F.Supp. 256, 260 (E.D.La.1965), held:

> "There simply is no right, privilege, or immunity secured to these plaintiffs by the Constitution and laws of the United States being in any way denied by these respondents when they allocate and disburse funds * * * * " [29]

Similarly, in Hess v. Mullaney, 213 F. 2d 635, 15 Alaska 40 (9th Cir. 1954), the Ninth Circuit upheld a property tax which returned a disproportionately small amount of funds to the taxpayers' locality.[30] Since this tax also supported the public schools, the plaintiffs' instant claim is analogous. See also General American Tank Car Corp. v. Day, 270 U.S. 367, 46 S.Ct. 234, 70 L.Ed. 635 (1926).[31] Compare Dean v. Coddlington, 81 S.D. 140, 131 N.W.2d 700 (1964); Sawyer v. Gilmore, 109 Me. 169, 83 A. 673 (1912); Orleans Parish v. State Board, 215 La. 703, 41 So.2d 509 (1949).[32]

### IV. Lack of Judicially Manageable Standards

Even if the Fourteenth Amendment required that expenditures be made only on the basis of pupils' educational needs, this controversy would be nonjusticiable. While the complaint does not present a "political question" in the traditional sense of the term, there are no "discoverable and manageable standards" [33] by which a court can determine when the Constitution is satisfied and when it is violated.[34]

The only possible standard is the rigid assumption that each pupil must receive the same dollar expenditures. Expenses are not, however, the exclusive yardstick of a child's educational needs. Deprived pupils need more aid than fortunate

---

29. Although the primary thrust of the complaint was directed against local segregation, the court squarely confronted the question now before this court, sustaining state legislation which provided that:
    "[A] large portion of the funds so allocated must be apportioned on a per educable basis, and the remaining distribution is made on a basis of equalization so as to provide and insure a minimum educational program in all public schools." 244 F.Supp. 258.

30. "It is argued that * * * in effect it [the taxation formula] amounts to an exemption from the tax of all this property within cities and districts * * *
    *      *      *      *      *
    " * * * No requirements of uniformity or of equal protection of the law limit the power of a legislature in respect to allocation and distribution of public funds." 213 F.2d 639–640.

31. "We are not concerned with the particular method adopted by Louisiana of allocating the tax between the State and its political subdivisions. That is a matter within the competency of the state legislature." 270 U.S. 372, 46 S.Ct. 235.

See Columbus Southern Railway v. Wright, 151 U.S. 470, 476–477, 14 S.Ct. 396, 38 L.Ed. 238 (1894).

32. Moreover the students are arguably complaining only about a property interest, rather than their personal liberty, so that the grievance does not fall within section 1343. With more money, plaintiffs could either attend private schools or move to a wealthy school district. See generally Gray v. Morgan, 371 F.Supp. 172, 174 (7th Cir. 1966). See also Abernathy v. Carpenter, 208 F.Supp. 793 (W.D.Mo. 1962), affirmed 373 U.S. 241, 83 S.Ct. 1295, 10 L.Ed.2d 409 (1963).

33. Reynolds v. Sims, 377 U.S. 533, 557, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).

34. Illustrating the lack of standards, plaintiffs' original complaint sought to have this court "order defendants to submit * * * a plan to raise and apportion all monies * * * in such a manner that such funds available to the school districts wherein the class of plaintiffs attend school will * * * assure that plaintiff children receive the same educational opportunity as the children in any other district * * *."

ones.[35] Moreover, a dollar spent in a small district may provide less education than one used in a large district. As stated above, costs vary substantially throughout the state. The desirability of a certain degree of local experimentation and local autonomy in education also indicates the impracticability of a single, simple formula. Effective, efficient administration necessitates decentralization so that local personnel, familiar with the immediate needs, can administer the school system. As new teaching methods are devised and as urban growth demands changed patterns of instruction, the only realistic way the state can adjust is through legislative study, discussion and continuing revision of the controlling statutes. Even if there were some guidelines available to the judiciary, the courts simply cannot provide the empirical research and consultation necessary for intelligent educational planning.[36] As early as 1919 Mr. Justice Holmes explained that "the Fourteenth Amendment is not a pedagogical requirement of the impracticable." Dominion Hotel v. Arizona, 249 U.S. 265, 268, 39 S.Ct. 273, 274, 63 L.Ed. 597 (1919).

Plaintiffs have assumed that requiring expenditures to be related to the needs of the students will result in better education for deprived students without a corresponding decrease in the quality of education now offered by the affluent districts. The more money the latter districts must supply to the former, how-ever, the less incentive the well-to-do will have to raise their tax rates. If the quality of good public schools declines, affluent children have the option to attend private schools,[37] thus completely eliminating the need for the wealthy to raise taxes.[38]

## V. Conclusion.

■ The present Illinois scheme for financing public education reflects a rational policy consistent with the mandate of the Illinois Constitution. Unequal educational expenditures per student, based upon the variable property values and tax rates of local school districts, do not amount to an invidious discrimination. Moreover, the statutes which permit these unequal expenditures on a district to district basis are neither arbitrary nor unreasonable.

■ There is no Constitutional requirement that public school expenditures be made only on the basis of pupils' educational needs without regard to the financial strength of local school districts. Nor does the Constitution establish the rigid guideline of equal dollar expenditures for each student.

Illinois' General Assembly has already recognized the need for additional educational funds to provide all students a good education. Furthermore, the legislative School Problems Commission assures a continuing and comprehensive study of the public schools' financial problems. If other changes are needed

---

35. Ideally, disadvantaged youth should receive more than average funds, rather than equal expenditures, so their potential can be fully developed. A rule coercing equal expenditures for all, especially if raised to a constitutional plane, would completely frustrate this ideal. See generally Kurland, "Equal Educational Opportunity: The Limits of Constitutional Jurisprudence Undefined," 35 U.Chi.L. Rev. 583, 591 (1968).

36. Compare Baker v. Carr, 369 U.S. 186, 282 & 323, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); Colegrove v. Green, 328 U.S. 549, 556, 66 S.Ct. 1198, 90 L.Ed. 1432 (1946); Coleman v. Miller, 307 U.S. 433, 454–455, 59 S.Ct. 972, 83 L.Ed. 1385 (1939).

37. See Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925).

38. Furthermore, the public schools' most acute financial crisis is in the large cities. But their struggles are only symptomatic of the overall decay of many urban centers. Despite the attempts of Congress and the state legislatures, the nation still does not have the solution to this degeneration, principally because there are not enough tax dollars to meet all needs. If the legislatures cannot solve these problems, surely the deep cutting edge of constitutional precepts is not the answer. Compare Avery v. Midland County, 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968) (Mr. Justice Fortas' dissent).

in the present system, they should be sought in the legislature and not in the courts. Plaintiffs have stated no grounds for judicial relief, and this cause must be dismissed.