STATE OF MAINE
CUMBERLAND, ss.

BUSINESS & COUNSUMER DOCKET
DOCKET NO. BCD-AP-18-02

MAINE EQUAL JUSTICE
PARTNERS, CONSUMERS FOR
AFFORDABLE HEALTH CARE, et al.,

   Petitioners,

  v.

COMMISSIONER, MAINE
DEPARTMENT OF HEALTH AND
HUMAN SERVICES,

   Respondent.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**ORDER ON M.R. CIV. P. 80C APPEAL
OF AGENCY ACTION**

Background

The following facts are taken from a joint stipulation of facts[1] submitted by Petitioner and Respondent as well as evidence taken over the course of a two-day hearing held on September 27-28, 2018. The parties filed post-hearing briefs and orally argued the issues on November 7, 2018.

On November 7, 2017 Maine voters approved a citizen-initiated bill entitled "An Act to Enhance Access to Affordable Health Care" (the "Expansion Act" or the "Act"). (Stip. ¶ 1); *See also* L.D. 1039, ch. 1, §§ A-1 to B-3 (referred to the voters, 128th Legis. 2017) (effective Jan. 3, 2018) (to be codified at 22 M.R.S. § 3174-G(1)(H)). The Act provides for the expansion of MaineCare[2] services to a new eligibility group (the

---

[1] The Court accepts in whole the facts contained in the joint stipulation.
[2] MaineCare is the state-administered program delivering medical services to individuals under the age of sixty-five who qualify for assistance according to the federal guidelines set out in 42 U.S.C. § 1396a(a)(10)(A)(i)(VIII) (i.e. Medicaid). Expansion under the Act allows Maine to take advantage of a provision of the Patient Protection and

1

"Expansion Group") defined therein. (Stip. ¶ 1.) A fiscal statement provided by the Office of Fiscal and Program Review ("OFPR")[3] estimated that when fully implemented, the Expansion Act will require net annual appropriations from the General Fund of $54,495,000. (Stip. ¶ 5.) The Act did not include its own funding mechanism, meaning that enacting legislation would be required to appropriate funds sufficient to meet this cost. Me. Const. art. V, § 4; *see also* Me. Const. art. IV, pt. 3, § 19 (measure referred to the people may or may not "provid[e] for raising new revenues adequate for its operation"). The Secretary of State informed voters of this on pages sixteen through eighteen of its *Maine Citizen's Guide to the Referendum Election: Tuesday, November 7, 2017.*[4]

On November 27, 2017, the Secretary of State certified the results of the 2017 referendum election. (Corr. Stip. ¶ 8.) On December 4, 2017, Governor Paul LePage issued a proclamation declaring the ballot measure adopted. (Corr. Stip. ¶ 8.) As amended by the Act, Title 22 M.R.S. § 3174-G(1) now requires the Department of Health and Human Services (the "Department") to deliver federally approved MaineCare services as follows:

> H. No later than 180 days after the effective date of this paragraph, a person under 65 years of age who is not otherwise eligible for assistance under this chapter and who qualifies for medical assistance pursuant to 42 United States Code, Section 1396a(a)(10)(A)(i)(VIII) when the person's income is at or below 133% plus 5% of the nonfarm income official poverty line for the applicable family size. The department shall provide such a person, at a

---

Affordable Care Act (commonly referred to as "Obamacare" or the "Affordable Care Act") that extends Medicaid coverage to the Expansion Group and provides for federal contribution at 90% coverage in and after 2020 and a higher proportional share prior to 2020.

[3] OFPR is a nonpartisan government office which collects, researches, and analyzes fiscal and program information related to the finances and operation of State government. (Stip. ¶¶ 3-4.)

[4] Available at https://www.maine.gov/sos/cec/elec/upcoming/citizensguide2017.pdf. The Court is permitted, perhaps required, to consider this information to the extent it is relevant to determine the voters' intent in approving the Act. *See Wawenock, LLC v. Me. Dep't of Transp.*, 2018 ME 83, ¶ 13, 187 A.3d 609.

2

minimum, the same scope of medical assistance as is provided to a person described in paragraph E.

. . .

No later than 90 days after the effective date of this paragraph, the department shall submit a state plan amendment to the United States Department of Health and Human Services, Centers for Medicare and Medicaid Services ensuring MaineCare eligibility for people under 65 years of age who qualify for medical assistance pursuant to 42 United States Code, Section 1396a(a)(10)(A)(i)(VIII).

The department shall adopt rules, including emergency rules pursuant to Title 5, section 8054 if necessary, to implement this paragraph in a timely manner to ensure that the persons described in this paragraph are enrolled for and eligible to receive services no later than 180 days after the effective date of this paragraph. Rules adopted pursuant to this paragraph are routine technical rules as defined by Title 5, chapter 375, subchapter 2-A.

L.D. 1039, ch. 1, § A-3 (to be codified at 22 M.R.S. § 3174-G(1)(H)).

On April 30, 2018, Maine Equal Justice Partners ("MEJP") and others filed a petition for review pursuant to M.R. Civ. P. 80C and 5 M.R.S. § 11001(2) (2017) based on the Commissioner's failure to initiate the implementation of the Expansion Act. On June 4, 2018, this Court entered partial judgment ordering the Commissioner to submit a state plan amendment ("SPA") to the United States Department of Health and Human Services, Centers for Medicare and Medicaid Services ("CMS"). *Me. Equal Justice Partners v. Hamilton*, No. BCD-AP-18-02, 2018 Me. Bus. & Consumer LEXIS 27, at \*\*17-18 (June 4, 2017). This Court did not address the Commissioner's failure to implement rulemaking as required by the Act because the issue was not yet ripe. *Id.* at \*6.

On June 7, 2018, the Commissioner filed a notice of appeal of this Court's June 4th order. On August 23, 2018, the Maine Supreme Judicial Court, sitting as the Law Court,

dismissed the Commissioner's appeal as interlocutory. *Me. Equal Justice Partners v. Comm'r*, 2018 ME 127, ¶ 11, ___ A.3d ___. The Law Court remanded the matter to this Court with instructions to dispose of the remaining issues in as timely a manner as possible. *Id.* Following remand, the Commissioner filed a SPA on September 4, 2018.[5] (Stip. ¶ 64.)

The Court granted a joint motion for the taking of additional evidence, *see* M.R. Civ. P. 80C(e). The Court also permitted the Office of the Attorney General ("OAG") to participate as an amicus in this matter, and the OAG submitted a brief and participated in the oral argument.

Discussion

As a threshold matter, the Commissioner argues that this proceeding is non-justiciable and that, pursuant to the separation of powers doctrine, the Court should refrain from deciding any disputed issues in this case. *See* Me. Const. art. III, § 2.

Pursuant to the Maine Constitution, neither the Legislative, Executive, nor Judicial Branch of government may "exercise any of the powers properly belonging to either of the others, except in cases herein expressly directed or permitted." Me. Const. art. III, § 2; *Maine Senate v. Sec'y of State*, 2018 ME 52, ¶ 27, 183 A.3d 749. Accordingly, courts exercise judicial restraint and will refuse to adjudicate matters if doing so would encroach upon the powers delegated to the Executive or Legislative Branches of government. *Maine Senate*, 2018 ME 52, ¶ 28, 183 A.3d 749.

---

[5] CMS has 90 days from this date in which to act on a SPA. 42 C.F.R. 457.160. That would mean that CMS could make its decision on or before December 4, 2018. However, the 90-day period may be tolled if CMS makes a written request for additional information. *Id.* At oral argument the parties could not agree on whether a recent request for information from CMS to DHHS had tolled this 90-day deadline.

4

In support of her argument, the Commissioner relies on the *Maine Senate* case in which the Law Court held that the separation of powers doctrine precluded the Court from determining whether, in the absence of a more specific appropriation, the Secretary of State lacked constitutional authority to expend previously appropriated money in order to implement ranked choice voting. *Id.* ¶¶ 25, 30. Because the Senate could not provide either a constitutional or a statutory basis to support its claim that the Secretary of State was acting beyond his constitutional authority, the Law Court stated that it would be improper for it to "assume any role in supervising the legislatively delegated tasks of the Secretary of State." *Id.* ¶ 29-30.

As in *Maine Senate*, this Court is being asked to determine the Executive Branch's authority to implement a ballot measure approved by the people but for which no specific appropriation has been made.[6] However, the controversy before this Court is significantly different from that presented in *Maine Senate*. This case involves allegations that DHHS has consistently refused to comply with specific deadlines and duties imposed by the Expansion Act, and it is actually undisputed that DHHS has missed every deadline imposed by the Expansion Act. In *Maine Senate,* the Law Court declined to enter into the controversy between some members of the Maine Senate and the Secretary of State. This case, by contrast, involves the obligation of the Executive Branch of government to faithfully execute the laws of the State. Me. Const. art. V, pt. 1, § 12. Ensuring that the

---

[6] Following the peoples' approval of the Act, the Legislature passed L.D. 837 (128th Legis. 2018), which would have appropriated $54,699,210 to the newly-established MaineCare Expansion Fund. The Governor, however, vetoed this bill and the Legislature did not override the veto. Petitioner's argument that the Governor's veto is a legal nullity is addressed below.

Executive Branch acts in accordance with statutory and constitutional law is a specific, and well-established grant of authority to the Judicial Branch that has been directly delegated to it by the Legislature through Maine's Administrative Procedures Act. 5 M.R.S. § 11001.

Furthermore, this case does not involve the Commissioner's discretionary use of appropriated money but her claim that she may not implement the Act because she is constitutionally or statutorily *prohibited* from expending money in the absence of a specific appropriation. *See* Me. Const. art. V, § 4. If the Court agrees with the Commissioner that a specific appropriation is required, then the Court also agrees that it could not invade the province of the Legislature and order such an appropriation. Me. Const. art. V, pt. 3, § 4. However, if the Court disagrees and finds that there is in fact a previous, existing general appropriation that is available, and that no constitutional or statutory impediment prevents its use by the Commissioner, then the Commissioner may not use the lack of a specific appropriation associated with the Expansion Act as justification for her refusal to faithfully execute the law. And as noted, determining whether the Executive Branch has faithfully executed the law, and ordering compliance if it has not, is a quintessentially judicial function. *See* 5 M.R.S. § 11001.

Accordingly, the separation of powers doctrine does not impede the Court's ability to decide the present controversy. If the Court determines that no constitutional or statutory provision prevents the Commissioner from faithfully executing the Act, then the Court may properly order the Commissioner to do so.[7]

---

[7] It should be noted that no individual denials of MaineCare coverage are before the Court. The issue is only whether the Commissioner must comply with the Act by submitting a SPA and adopting rules to ensure that qualifying persons in the Expansion Group are enrolled for and eligible to receive MaineCare services. Counsel for the parties informed

The remaining issues then to be decided by the Court are: (1) the date on which the Act became operative; (2) whether the lack of a supplemental appropriation poses a statutory or constitutional barrier to implementing the Act; (3) the Governor's authority to veto the Legislature's supplemental MaineCare appropriation; and (4) what relief, if any, is available to Petitioners.

### 1. The Effective Date and the Operative Date of the Act.

Because the Governor made public proclamation of the results of the vote on the Act on December 4, 2017, the Act became effective 30 days later on January 3, 2018. Me. Const. art. IV, pt. 3, § 19. The parties do not dispute this. However, the parties do dispute whether the Act became *operative* on January 3 and the effect that any inoperative period may have had on the timelines for implementing the Act.

Pursuant to the Maine State Constitution:

> Any measure referred to the people and approved by a majority of the votes given thereon shall . . . *take effect and become a law* in 30 days after the Governor has made public proclamation of the result of the vote on said measure . . . provided, however, that any such measure which entails expenditure in an amount in excess of available and unappropriated state funds shall remain inoperative until 45 days after the next convening of the Legislature in regular session, unless the measure provides for raising new revenues adequate for its operation.

Me. Const. art. IV, pt. 3, § 19 (emphasis added).

Both parties urge the Court to make a finding as to whether the Act would entail expenditure in an amount in excess of available and unappropriated funds as of a particular

---

the Court that after a recent group fair hearing, *see* 22 M.R.S. § 3181, DHHS's position was rejected by the Hearing Officer. If DHHS continues to deny coverage for the thousand or so individuals who have applied for medical services under the Expansion Act, it could be months before any of those individuals could seek relief in the Superior Court.

7

date in order to determine the applicability of section 19's "inoperative clause." However, the parties dispute which date should be used in making this finding. Petitioners urge the Court to adopt a March 1, 2018 projection that there would be $74,631,183 in available and unappropriated funds at the end of Fiscal Year 2018, and a cumulative balance of $141,029,852 at the end of Fiscal Year 2019. (Stip. ¶ 16.) The Commissioner urges the Court to adopt a December 1, 2017 projection that there would be $35,758,678 in available and unappropriated funds at the end of fiscal year 2018, and a cumulative balance of $12,549,953 at the end of fiscal year 2019. (Stip. ¶ 15.)

Maine's Constitution is silent in regard to what standards are to be used to determine whether, and when, there are available and unappropriated funds, much less which branch of government is to make this determination. It is clear to the Court, however, that the purpose of making inoperative any citizen's initiative entailing an expenditure in excess of available and unappropriated funds is to give the Legislature adequate time in which to provide the necessary funding required by the ballot measure. Op. Me. Att'y Gen. (Aug. 9, 1977).

In Maine, the power of the Legislature is paramount and subject only to the limitations established by the Constitution. *Opinion of the Justices*, 2015 ME 107, ¶ 43, 123 A.3d 494 (citing *Sawyer v. Gilmore*, 109 Me. 169, 180, 83 A. 673 (1912)). In contrast to the Legislature's broad authority, the Executive and Judicial Branches of government may only exercise those powers granted to them by the Maine Constitution. *Id.* Given these tenets and bearing in mind the purpose of section 19's inoperative clause, the Court believes that it is the Legislature's prerogative to determine the standards by which to

8

assess the amount of available and unappropriated funds. The appropriation process is conducted by the relevant committees and leadership of the Legislature in "real time" and in conjunction with the OFPR. (Sep. 27 Tr. 30-37.) The Court would therefore be making a quintessentially legislative decision if it were to determine what date to use in making this assessment. Accordingly, the Court declines to do so in this instance.

In any event, the appropriate date and figures are of no legal consequence. Contrary to the Commissioner's argument, even if the Act were rendered inoperative for 45 days beginning January 3, 2018, the timing provisions for implementing the Act are not tolled. Section 19 makes clear that a ballot measure approved by the people, such as the Act, is effective and *becomes law* 30 days after the Governor has made public proclamation. Me. Const. art. IV, pt. 3, § 19. Therefore, the Act became law—and binding upon the Executive Branch—on January 3, 2018. As discussed above, the purpose of rendering a ballot measure inoperative is to give the Legislature time to provide funding. Its purpose is not to give the Executive Branch more time to comply with legislative acts. Op. Me. Att'y Gen. (Aug. 9, 1977). Nothing in section 19 indicates that the timing provisions of an act which has become law but is inoperative are tolled and, as the Supreme Judicial Court stated in an Opinion of the Justices, once an act becomes operative, its provisions apply to events that occurred prior to its operative date. *Opinion of the Justices*, 460 A.2d 1341, 1347 (Me. 1982). Accordingly, if an act is rendered inoperative by section 19, it simply becomes unenforceable during the 45-day period within which the Legislature has been given time to act; once this 45-day period has elapsed, the provisions of a previously inoperative measure become fully enforceable. Consequently, the Commissioner had the obligation to

9

comply with the deadlines set by the Act and which are determined by reference to the Act's effective date, regardless of the Act's "operativity" during the forty-five-day period following its effective date.

Having found that the deadlines in the Act run from the effective date, and not the operative date, and having found that the effective date of the Act is January 3, 2018, the Court will order the Commissioner to file an amended SPA with CMS reflecting the correct effective date of the Act to be January 3, 2018.[8]

### 2. No Constitutional or Statutory Provision Prevents Implementation of the Act

The second issue before the Court is whether the Commissioner may refuse to implement the Expansion Act for any constitutional or statutory reason. In its May 2018 merits brief, the Commissioner identifies one constitutional provision and three sections of title 5 of the Maine Revised Statutes which purportedly prevent implementation of the Act.[9]

---

[8] After this matter was taken under advisement, Petitioners filed on November 15, 2018 a letter with the Court asking to clarify their request for relief. The Respondent then filed a letter on November 19, 2018 reiterating their argument that this Court could not require the Commissioner to file an amended SPA correcting the effective date or requiring the Commissioner to inform CMS about whatever relief might be provided in this Order. The claim is that this would be tantamount to ordering a receivership. The Court is keenly aware of what would have to happen in this case or any case before it could impose a receivership on an Executive Branch agency. *Bates v. Dep't of Behavioral and Developmental Servs.*, 2004 ME 154, ¶¶ 86-87 & n.13, 863 A.2d 890. The requirement to file a SPA was one created by the Expansion Act, not this Court and the parties informed the Court that CMS recently notified the Commissioner that a new SPA was required to be filed. In addition, determining the effective date of a law in Maine must be made by reference to the Maine Constitution as interpreted by the Judicial Branch. It is not something that can be determined by the federal bureaucracy, or by creation of a "placeholder" date selected by the Executive Branch.

[9] The provisions are as follows: Me. Const. art. V, pt. 3, § 4 ("[n]o money shall be drawn from the treasury, except in consequence of appropriations or allocations authorized by law"); 5 M.R.S. § 1543 ("Money may not be drawn from the State Treasury except in accordance with appropriations duly authorized by law. Every disbursement from the State Treasury must be upon the authorization of the State Controller and the Treasurer of State…"); 5 M.R.S. § 1582(1) ("A state department may not establish a new program or expand an existing program beyond the scope of the program already established, recognized and approved by the Legislature until the program and the method of financing are submitted to the Department of Administrative and Financial Services, Bureau of the Budget for evaluation and recommendation to the Legislature and until the funds are made available for the program by the Legislature"); 5 M.R.S. § 1583 ("No agent or officer of the State or any department or agency thereof, whose duty it is to expend money under an appropriation by the Legislature, shall contract any obligation on behalf of the State in excess of the appropriation. Whoever exceeds in his expenditure said appropriation shall not have any claim for reimbursement. Any person who knowingly violates this section shall be guilty of a Class E crime.").

10

In effect, these provisions constrain the authority of Executive Branch officials by requiring that they not exceed the limit of appropriated funds. The Commissioner argues that unless the Legislature enacts a supplemental appropriation, the provision of MaineCare services to the Expansion Group could cause the Commissioner to exceed the amount of public money currently appropriated to the MaineCare account. Therefore, the Commissioner argues that she is legally prohibited from implementing the Act.

As noted in this Court's June 4 order, the submission of a SPA is revenue neutral and will not require the expenditure of any appropriated funds. Similarly, the implementation of rulemaking is also revenue neutral and will not require expending appropriated funds. Accordingly, none of the identified constitutional or statutory provisions can be used by the Commissioner in refusing to comply with the Act's mandate that the Commissioner submit a SPA and initiate rulemaking. Moreover, the intent of the law is clear. The Commissioner is required to take certain steps in a certain order in preparation for the enrollment of the thousands of Maine citizens who may be eligible to receive benefits under the Expansion Act. Those steps include submission of the SPA, and writing rules.

However, in contrast to both the SPA and rulemaking requirements, the provision of MaineCare services to eligible recipients will entail the expenditure of appropriated funds. The Court must therefore address whether any existing appropriation is legally available to the Commissioner to provide for the delivery of approved services.

The current biennial budget appropriates $417,695,193 of State money to the Commissioner for fiscal year 2018-19 to be used for the payment of providers who furnish

11

services to MaineCare patients.[10] 2017 P.L. ch. 284, § A-34; (Sep. 27 Tr. 23-24). This general appropriation does not restrict expenditures to only those payments made for specific services or particular eligibility groups. *See* 2017 P.L. ch. 284, § A-34. The Commissioner has not pointed to any constitutional or statutory provision which would prevent her from using the existing general appropriation to pay for services to the Expansion Group.

Moreover, the OAG has opined in a remarkably similar situation that funds previously appropriated to a general account may be used to cover expenses incurred by an eligibility class that did not exist at the time of the appropriation. Op. Me. Att'y Gen. (Apr. 21, 1978).[11] As discussed in the opinion, the Legislature had enacted a law expanding the eligibility criteria for the medically needy program. While the law was effective April 6, 1978, the accompanying appropriation was not effective until July 1, 1978, the beginning of fiscal year 1979. In his letter to the Commissioner of the Department of Health and Human Services, then-Attorney General Joseph Brennan stated it was his opinion that "[i]f funds have been appropriated in fiscal year 1978 for the medically needy program as it existed prior to amendment, then the medically needy program would continue but with

---

[10] Specifically, this appropriation was made to the Medical Payments to Providers 0147 account (the "0147 account").

[11] This Attorney General's opinion is also consistent with the approach recently taken by the Legislature. At the September evidentiary hearing, the Court admitted the Commissioner's exhibit 13 which is L.D. 319 (127th Legis. 2015). L.D. 319 is the law which expanded MaineCare coverage to include reproductive healthcare and family planning services. (Resp't's Ex. 13.) When the Legislature appropriated money for these new services, the appropriation was made to the 0147 account which is the general MaineCare account available for all MaineCare services. (Resp't's Ex. 13; Testimony of Luke Lazure, Sep. 27 Tr. 24-27.) Importantly, the appropriation was not specifically earmarked to be used solely for reproductive healthcare and family planning services. (Resp't's Ex. 13.) This shows that when the Legislature adds new services, it has in the recent past provided that those services be paid from monies appropriated to and comingled with the general MaineCare account, and that there is no need for those services to be funded from a separate, dedicated account. This approach is exactly consistent with what the Law Court was referring to in *Maine Senate* when it recognized that agencies (or the Secretary of State) must be given flexibility to make decisions to use already appropriated funds to address new needs.

the expanded" class of eligible beneficiaries. This supports the proposition that an appropriation provided by the Legislature may be used to cover expenses incurred by a class of beneficiaries which was created after the appropriation was provided.

In the federal context, the Office of the Comptroller General has reached the same conclusion; i.e. that existing appropriations may be used to fund newly imposed statutory duties where the "new duties . . . bear a sufficient relationship to the purpose for which the existing appropriation was made." *Use of Oprt'g Funds for Appnt'g Magistrates Pursuant to the D.C. Family Ct. Act of 2001*, B-290011 (Comp. Gen. Mar 25, 2002); *see also Dep't of Health & Hum. Srvs.- Risk Corridors Program*, B-325630 (Comp. Gen. Sept. 30, 2014).

Because the existing appropriation to the 0147 account contains no limitation as to what eligibility class the funds may be used for, there is nothing preventing the Commissioner from providing assistance to the Expansion Group in the same manner as she provides assistance to the previously existing eligibility groups. *See Manirakiza*, 2018 ME 10, ¶ 15, 177 A.3d 1264.

Despite the ability of the Commissioner to use the existing appropriation to the 0147 account to pay for services provided to the Expansion Group, once those funds have been exhausted the Court agrees with the Commissioner that she may lawfully refuse to provide coverage to that group. Me. Const. art. V, pt. 3, § 4; *See also* Op. Me. Att'y Gen. (Apr. 21, 1978). At the September 2018 hearing, Luke Lazure, a non-partisan legislative analyst in the OFPR, testified that if MaineCare services were furnished to the Expansion Group, the estimated earliest date that the Department's provider payment fund would be exhausted is

13

May 29, 2019.[12] (Sep. 27 Tr. 35.) Accordingly, any depletion of the Department's funds would not occur until a future date. Further, Mr. Lazure also testified that the Legislature has multiple options through which it can address a shortfall in an existing appropriation. (Sep. 27 Tr. 43.) These options include the enactment of a supplemental budget, increased tax rates, or the elimination of eligibility groups. (Sep. 27 Tr. 43-44; Stip. ¶ 46.) Because any shortfall in funds will not occur until a future date, and because the incoming Legislature may address any shortfall that may occur, the Court concludes that the statutes and constitutional provisions cited by the Respondent do not provide legal justification to the Commissioner excusing her refusal to immediately implement the Act.

Because an existing appropriation is available which the Commissioner may legally utilize to implement the Act, she must do so. Although the Governor may believe implementation to be unwise and disagree with the Act as a matter of policy, he may not ignore the will of the people and refuse to take any action toward accomplishing the policy objectives of the Act. *See Opinion of the Justices*, 376 N.E.2d 1217, 1221 (Mass. 1978) ("It is not within the Governor's official competence to decide that the objectives of any validly enacted law are unwise and, therefore, that no effort will be made to accomplish such objectives."). Instead, any deficiency in the funding mechanism for MaineCare expansion must be solved by the Legislature.

---

[12] There is no dispute that even if services are not provided to the Expansion Group that the 0147 account is nonetheless projected to be exhausted by June 26, 2019. (Jt. Ex. 2.) Under the Commissioner's logic, it would follow from this fact that the Commissioner could refuse to pay for MaineCare benefits for *any* eligibility category based on concern about a *future* depletion of this account.

14

It is also not lost on the Court, and even the Commissioner agrees, that the general MaineCare account always has to be replenished on a regular basis. Adjustments are constantly made by the Legislature, as Mr. Lazure clearly and credibly explained. That is the kind of fiscal challenge that the Legislature routinely deals with, and the Maine Legislature is set to convene again in December 2018. As the OAG stated in its amicus brief, this fiscal problem is not the Court's problem to fix. Nor is it the Executive Branch's problem to fix by refusing to implement the Expansion Act, particularly where it is clear from the record that funds in the account are not close to being depleted. The Commissioner is certainly entitled to disagree with the policy behind MaineCare expansion, but the people have spoken and did so over a year ago. A potential, *future* fiscal crisis, based only on projections that are now many months old, is not at all the same thing as a "fiscal emergency" that could justify refusing to implement the Expansion Act. The Commissioner can point to nothing in the factual record which supports her position that a lack of available funds prevents her from beginning implementation of the Expansion Act.[13]

### 3. The Governor's Power to Veto the Legislature's Appropriation Bill

On July 2, 2018, Governor LePage vetoed L.D. 837 (128th Legis. 2018), which would have funded the Act through the establishment of the MaineCare Expansion Fund. If enacted, L.D. 837 would have appropriated up to $54,699,210 and specifically allocated those funds to the MaineCare Expansion Fund. The bill appropriated $31,159,210 from the

---

[13] In *Manirakiza*, our Law Court recognized that the language of appropriation bills is generally unallocated, consistent with its "temporary" application—an implicit acknowledgement that appropriations are always subject to change. 2018 ME 10, ¶ 11, 177 A.3d 1264.

15

unappropriated surplus of the General Fund and $23,540,000 from the unallocated balance of the Fund for a Healthy Maine. In his veto message, Governor LePage specifically cited these sources of revenue as his justification for vetoing the bill, describing it as a "hasty, ill-conceived proposal drawing upon two unsustainable budget gimmicks[.]" Governor LePage was also clear that he opposed MaineCare expansion as a matter of policy but "recognized that it is the law." A week later, on July 9, 2018, a reconsideration motion in the Maine House failed to garner the two-thirds majority required to overcome the veto, with the effect of sustaining the Governor's veto of L.D. 837. *See* Me. Const. art. IV, pt. 3, § 2.

Petitioners argue that the Governor's veto is a legal nullity. Petitioners ground their argument in the text of Me. Const. art. IV, pt. 3, § 2 and the historical context giving rise to that particular amendment of Maine's Constitution. Respondents counter that the Maine Constitution unambiguously gives the Governor the power to veto virtually any bill approved by the Legislature. Me. Const. art. IV, pt. 3, § 2. Respondents concede that pursuant to section 19, the Governor cannot veto an initiated bill approved by the people, such as the Act.

Section 19 provides that the Governor cannot veto any measure approved by the people:

> The veto power of the Governor shall not extend to any measure approved by vote of the people, and any measure initiated by the people and passed by the Legislature without change, if vetoed by the Governor and if the veto is sustained by the Legislature shall be referred to the people to be voted on at the next general election.

16

Me. Const. art. IV, pt. 3, § 19. Petitioners argue that a gubernatorial veto with the effect of thwarting an initiated bill enacted by the people cannot be valid. (*See* Stip. ¶ 72.) *See State ex rel. Dahl v. Dewing*, 131 N.W.2d 434 (N.D. 1964) (governor's line-item veto of funding for position established by ballot initiative invalid).

Section 2 provides that the Governor may "disapprove" (i.e. veto) any bill that must pass through both houses of the Legislature:

> Every bill or resolution, having the force of law, to which the concurrence of both Houses may be necessary, except on a question of adjournment, which shall have passed both Houses, shall be presented to the Governor, and if the Governor approves, the Governor shall sign it; if not, the Governor shall return it with objections to the House in which it shall have originated, which shall . . . proceed to reconsider it.

If Petitioners' broad interpretation of section 19 is correct, this at best sets up an irreconcilable conflict between section 19 and section 2 of part 3 of article four of the Maine Constitution: L.D. 837 is a "bill or resolution, having the force of law, to which the concurrence of both Houses may be necessary" and is not "on a question of adjournment." Me. Const. art. IV, pt. 3, § 2. *But see Op. of the Justices*, 2015 ME 107, ¶ 44, 123 A.3d 494 (stating that although "the Governor's authority to object to legislation, to communicate those objections to the Legislature, and to require the Legislature to consider and act upon those objections must not be limited or infringed upon[;]" nonetheless, "because *the Executive is not endowed in American democracy with absolute veto power*, the Legislature must be able to anticipate and act upon the Governor's objections and, where it determines it appropriate, *override those objections*") (emphasis added).

17

The Court concludes this is not the case in which to decide this "important or doubtful question[]" of constitutional law,[14] despite the fact that both sides urge the Court to resolve it. The Court concludes that it need not be decided to order the relief requested by Petitioners based on the record before the Court. *See In re Reben*, 342 A.2d 688, 689 (Me. 1975) (courts "should, except in compelling situations, decide only issues which are necessary to the disposition of the case before" them); *see also Buchanan v. Maine*, 469 F.3d 158, 172 (1st Cir. 2006) ("It is a fundamental and longstanding principle of judicial restraint that courts [should] avoid reaching constitutional questions in advance of the necessity of deciding them.") (alteration in original) (quotation omitted). Simply put, whether the Governor's veto of L.D. 837 stands or not, *there are still funds in the MaineCare account* that are already allocated to reimburse providers for medical services furnished to qualified persons under the federal Medicaid statute, as explained above. Because it is undisputed that the Act is the law of the land in the State of Maine, the Expansion Group now qualifies for MaineCare services, just like any other eligible group extant under 22 M.R.S. § 3174-G(1). To be sure, L.D. 837 would have specifically allocated additional funds to pay for claims arising out of the provision of medical services to the Expansion Group, but as found above, there is no constitutional or statutory

---

[14] *See* M.R. App. P. 24(a). At various times since this case was remanded on August 23, 2018, the Court has discussed with the parties the possibility that the veto issue presented "a question of law . . . of sufficient importance or doubt to justify a report to the Law Court for determination." *Id.* Although there is agreement between the parties and the Court that the question is sufficiently "important and doubtful" and the facts material to the question are not in dispute, *see* M.R. App. P. 24(a)(1), (2); there was also general agreement that such report could further complicate this matter and result in further delay. *See Me. Eq. Justice Partners*, 2018 ME 127, ¶ 11, __ A.3d __. Furthermore, as explained in more detail below, it is not necessary to decide this issue to dispose of this case. *See Sirois v. Winslow*, 585 A.2d 183, 185 (Me. 1991) ("[J]udicial restraint requires [the Law Court] to cautiously approach constitutional questions presented on report . . . .").

18

impediment preventing use of funds already appropriated to the general MaineCare account to provide services for individuals who qualify.

4. Relief

Both the Commissioner and the OAG argue that if this Court orders the Commissioner to implement the Act it should allow the Commissioner to make the provision of services contingent upon federal approval of the SPA. This argument, however, is inconsistent with the plain language of the Act which requires the Commissioner, as noted above, to accomplish certain acts in a certain order to ensure that persons in the Expansion Group are enrolled and eligible to receive services no later than 180 days after the effective date of the Act. Although the Act mandates that the Commissioner submit a SPA no later than 90 days prior to its 180-day deadline for providing services, the Act contains no language making the provision of services contingent upon federal approval of the SPA. The Court believes the Commissioner is essentially asking it to "amend" the Act, and it obviously has no power to do so. Moreover, under federal regulations, states are eligible to receive federal reimbursement for the provision of Medicaid services that are provided pursuant to a court order or to carry out a hearing decision. 42 C.F.R. 431.250(b). Consequently, federal approval of the SPA is not the only way to obtain federal financial participation. *Chisholm v. Kliebert*, No. 97-3274, 2013 U.S. Dist. LEXIS 114812, at *35 (Aug. 13, 2013).

The Court recognizes that the Commissioner belatedly filed a SPA on September 4, 2018. However, it is clear from the history of this case that the positions taken by the Commissioner have changed over time. The Commissioner still refuses to begin

19

rulemaking in clear violation of the Expansion Act. And while sometimes acknowledging that the Expansion Act is the law of the land, the Commissioner has also essentially taken the position, most recently in administrative proceedings which are still ongoing, that the class of Maine citizens who are or may be eligible for MaineCare benefits under the Expansion Act does not actually exist. The denials issued to persons who have applied under the Expansion Act advise as follows: "…no such coverage group is available in the MaineCare Eligibility Manual. (Stip. ¶ 59).

Therefore, having found that the Commissioner has failed and refused to comply with the Expansion Act, the Court declares the following, and orders the Commissioner to comply with the Expansion Act as follows:

1. The Court finds that the effective date of the statute, I.B. 2017, ch. 1, is January 3, 2018;

2. The Court finds that the 45-day "temporarily inoperative" period required by section 19 of Article IV, part 3 of the Maine Constitution has run and does not in any way change the effective date of the statute;

3. The Court finds that 90 days from the effective date is April 3, 2018 and 180 days from the effective date is July 2, 2018;

4. The Court finds that the Commissioner was required to adopt rules and begin implementation of the Expansion Act no later than July 2, 2018;

5. The Court finds and concludes that there is no constitutional or statutory impediment which prevents the Commissioner from using existing appropriations to the Payment to Providers 1047 account to implement the Expansion Act;

6. The Commissioner is ordered to amend the eligibility SPA it submitted to the federal government on September 4, 2018 to reflect an effective date of the Expansion Act to be January 3, 2018; the effective date requiring coverage to be July 2, 2018; and to inform CMS that no constitutional or statutory impediment exists which prevents the

20

Commissioner from using existing appropriations to implement the Expansion Act. The Commissioner must further take all necessary steps to ensure that approval of the SPA is retroactive to July 2, 2018;

7. The Commissioner is ordered to adopt rules as required by the Expansion Act, retroactive to July 2, 2018, and to do so by December 5, 2018 which is the date the Maine Legislature comes into session. Me. Const. art. IV, pt. 3 § 1. The rules must ensure that persons who meet the criteria for coverage as defined in the Expansion Act are enrolled for and eligible to receive MaineCare services as of July 2, 2018.

The clerk is directed to incorporate this order into the docket by reference. M.R. Civ. P. 79(a).

Date: ___11/21/18___

M. Michaela Murphy
Justice, Superior Court

Entered on the Docket: 11/21/18
Copies sent via Mail___Electronically ✓

21

STATE OF MAINE                          BUSINESS AND CONSUMER COURT
CUMBERLAND, ss                          CIVIL ACTION
                                        Doc. No. BCD-AP-18-02


MAINE EQUAL JUSTICE PARTNERS,    )
CONSUMERS FOR AFFORDABLE         )
HEALTH CARE, et al.              )
                                 )
            Petitioners          )
                                 )        **ORDER ON RESPONDENT'S**
    v.                           )        **MOTION TO STAY**
                                 )
RICKER HAMILTON, COMMISSIONER    )
MAINE DEPARTMENT OF HEALTH       )
AND HUMAN SERVICES               )
                                 )
            Respondent           )


On June 4, 2018 this Court issued an Order in the above-captioned matter requiring

Commissioner Ricker Hamilton of the Maine Department of Health and Human Services

("DHHS") to submit a State Plan Amendment ("SPA") no later than June 11, 2018 to the United

States Department of Health and Human Services, Centers for Medicare and Medicaid Services

ensuring MaineCare eligibility for Maine people under 65 years of age who qualify for medical

assistance pursuant to 42 U.S.C. § 1396(a)(10)(A)(i)(VIII).

On June 7, 2018, Commissioner Hamilton timely filed an appeal of that Order to the

Supreme Judicial Court along with a Motion to Expedite Briefing in which the Commissioner

requested clarification from the Law Court that this Court's June 4, 2018 Order would be

automatically stayed pending appeal based on Rule 62(e) of the Maine Rules of Civil Procedure.


1

Maine Equal Justice Partners ("MEJP") responded by filing in the Law Court an Opposition to Motion to Stay Pending Appeal and a Partial Objection to the Motion to Expedite Briefing.

On June 11, 2018 the Law Court issued an Order on Motion to Stay citing "a lack of clarity in the Commissioner's motion to stay as to the relief being sought and the failure of the parties to seek a ruling from the Superior Court as to the status of its order pending appeal." *Maine Equal Justice Partners v. Commissioner, DHHS*, 2018 ME ___ (Super. Ct. Docket No. BCD-18-02), Order on Motion to Stay, June 11, 2018. The Law Court further suspended the provisions of M.R. App. P. 3(b) "to the extent necessary to permit the Superior Court to act on the parties' formal motions to determine the immediate enforceability of the Superior Court's order pending appeal or for any stay or injunction pending appeal." *Id.*

That ruling effectively restored the Superior Court's jurisdiction over this case. The Law Court also directed this Court to act on the motion to stay, while at the same time preserving the parties' rights to reassert their arguments regarding the propriety of a stay of the Superior Court's Order when the matter shortly returns to the Law Court.

After the Law Court's order was received by this Court, counsel for MEJP represented to this Court by letter that the parties had agreed that this Court should expeditiously act based on the filings they made in the Law Court on the Commissioner's motion for stay. On June 12, 2018 the Court conferred telephonically with counsel for the parties and directed them to file any supplemental arguments simultaneously with this Court by close of business June 13, 2018, with rebuttal arguments by close of business June 14, 2018.[1]

---

[1] The Court in the teleconference directed the parties to address the practical effects on the Superior Court if no stay was issued while the Law Court considers Commissioner Ricker's appeal, and invited them to argue as to whether this was a factor that the Court could or should consider. The Court expressed concerns as to how other expected litigation between the parties would be managed in the Superior Court if individuals who believed they were qualified to receive Medicaid benefits pursuant to the expansion law applied to DHHS for coverage and were denied. The Court concluded after considering the parties' arguments that those cases are likely to be filed

2

The motion presents two separate legal issues: first, whether this Court's June 4, 2018 order is automatically stayed pending appeal under M.R. Civ. P. 62(e); second, if it is not, whether the Commissioner can satisfy the four criteria for obtaining a stay of the Order under M.R. Civ. P. 62(g), which essentially requires this Court to decide if the Commissioner can establish each of the four criteria for obtaining injunctive relief.

*The Automatic Stay Provision of Rule M.R. Civ. P. 62(e) does not apply.*

The automatic stay provision of M.R. Civ. P. 62(e) does not apply to orders issued by the Superior Court on administrative appeals pursuant to M.R. Civ. P. 80C, *Nat'l Org. for Marriage v. Comm'n on Governmental Ethics & Elections Practices*, 2015 ME 103, ¶ 12, 121 A.3d 792. Rule 62(e) provides for stay of execution of a final judgment pending a filed appeal, with certain exceptions. M.R. Civ. P. 62(e). In *Nat'l Org. for Marriage*, the Law Court stated that "the plain language of 'execution upon the judgment' in Rule 62(e) does not include agency actions because they are not judgments upon which an execution may issue." *Id.* ¶ 10 (citing M.R. Civ. P. 69). The June 4, 2018 Order constituted the Court's ruling on an administrative appeal brought pursuant to M.R. Civ. P. 80C. As such, there is no applicable automatic Rule 62(e) stay effectuated by Respondent's filing of an appeal.[2]

---

irrespective of whether a stay is issued by this Court, and if they are filed, could be effectively case-managed to protect the rights of all parties while the Law Court considers the Commissioner's appeal.

[2] Petitioners argue that the Rule 62(e) automatic stay is not applicable because M.R. Civ. P. 81(c) requires that the rules applicable to injunctions apply to rulings from M.R. Civ. P. 80B appeals, and because M.R. Civ. P. 80C was derived from 80B, the rules applicable to injunctive relief should be applied to relief granted on an M.R. Civ. P. 80C appeal. By that reasoning, the Rule 62(e) automatic stay would not apply. The Court does not address this reasoning because the Court concludes that *Nat'l Org. for Marriage* is dispositive on this issue.

3

*The Commissioner cannot establish on this record all four criteria required to obtain injunctive relief as required by Rule 62(g).*

In order to evaluate the merits of Respondent's motion for stay based upon the Court's inherent authority as found in M.R. Civ. P. 62(g),¹ the Court must look to the four-factor test for granting injunctive relief. According to the test, a party seeking a stay must demonstrate:

> that (1) it will suffer irreparable injury if the stay is not granted; (2) such injury outweighs any harm which granting the stay would inflict on the other party; (3) it has a likelihood of success on the merits (at most, a probability; at least, a substantial possibility); and (4) the public interest will not be adversely affected by granting the stay.

*Nat'l Org. for Marriage*, 2015 ME 103, ¶ 14, 121 A.3d 792 (citing *Bangor Historic Track, Inc. v. Dep't of Agric., Food & Rural Res.*, 2003 ME 140, ¶ 9, 837 A.2d 129; *Dep't of Envtl. Prot. v. Emerson*, 563 A.2d 762, 768 (Me. 1989)); *see also Respect Maine PAC v. McKee*, 622 F.3d 13, 15 (1st Cir. 2010). These factors are "not to be applied woodenly or in isolation from each other; rather, the court of equity should weigh all of these factors together in determining whether injunctive relief is proper in the specific circumstances of each case." *Emerson*, 563 A.2d 762, 768. "Clear evidence of irreparable injury should result in a less stringent requirement of certainty of victory; greater certainty of victory should result in a less stringent requirement of proof of irreparable injury" *Id.* (citing *Developments in the Law -- Injunctions*, 78 Harv. L. Rev. 994, 1056 (1965)).

It is important to note, particularly with respect to the first criteria requiring the establishment of irreparable harm, that what the June 4, 2018 Order required was that the

---

¹ "The provisions in this rule do not limit any power of the Superior Court or Law Court during the pendency of an appeal to suspend, modify, restore, or grant an injunction or to make any order appropriate to preserve the status quo or the effectiveness of the judgment subsequently to be entered." M.R. Civ. P. 62(g).

Commissioner file the SPA. The Commissioner has not demonstrated that irreparable harm will be caused by complying with the expansion law's unambiguous requirement that this document be filed. The Commissioner argues, however, that the SPA acts as a binding contract with the federal government obligating the state to expend funds for the provision of benefits and that filing the SPA would amount to irreparable harm to DHHS.

In response, Petitioners cite to *Natl. Fedn. of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012). In *Sebelius*, the United States Supreme Court held that the Secretary of Health and Human Services could not constitutionally "withdraw existing Medicaid funds for failure to comply with the requirements set out in the expansion," thereby making expansion voluntary and allowing States to opt in and out of the program. *Id*. 585-586. The Court has already concluded in its June 4, 2018 Order that the SPA is not, and cannot be equated with, a binding contract. The United States Supreme Court has held, as a constitutional matter, that any State's participation in Medicaid expansion is voluntary. Further, it is undisputed that the Maine Legislature or Maine people could enact legislation withdrawing from the program. The Commissioner's argument that once Maine opts in, it can never opt out remains unpersuasive.

With respect to the second criteria, the Court further finds that the harm to the Petitioners of being without MaineCare benefits to which they are statutorily entitled outweighs any harm to the Commissioner or DHHS resulting from a denial of the motion to stay.

As to the third criteria, concerning whether the Commissioner has established a likelihood of success on the merits, the Court in its June 4, 2018 Order has already rejected the Commissioner's arguments regarding when the expansion law became effective, whether Maine statutes prevent the Commissioner from complying with the law, as well as his core claim that the judicial branch cannot enforce the expansion law without violating the doctrine of separation

5

of powers. The Court therefore cannot at this stage find that the Commissioner is more likely than not to succeed on the merits.

Finally, in considering the fourth criteria, whether the public interest would "not be adversely affected by granting the stay," the Court concludes that granting the stay would be adverse to the public interest. The executive branch's refusal to act and follow the will of the people, as legislatively codified in 2017 I.B. 2, has the potential to engender disrespect for duly enacted laws. The Court does recognize that an order denying a stay could cause some uncertainty that could result in further litigation including further motions, or further appeals regarding other deadlines established in the expansion law that were not addressed in the June 4, 2018 Order. The Court would note in this regard that the parties have appropriately and in good faith asked the Law Court to expedite its review of this Court's orders. The Court therefore concludes that the potential for this uncertainty is not so great as to overcome the Commissioner's failure to demonstrate irreparable harm, likelihood of success on the merits, or that the balance of harms weighs more heavily against the Commissioner.

Because the Commissioner has not met any of the four criteria for obtaining injunctive relief, this Court denies the Commissioner's motion for stay pending review of this order by the Law Court.

The Clerk is directed to incorporate this Order into the docket by reference pursuant to M.R. Civ. P. 79(a).

DATE: 6/15/18

Michaela Murphy
**Superior Court Justice**
**Business and Consumer Court**

Entered on the Docket: 6/15/18
Copies sent via Mail___Electronically ✓

6

Maine Equal Justice Partners, Consumers for Affordable Health Care, et al.

v.

Ricker Hamilton, Commissioner, DHHS


**Plaintiffs**

Maine Equal Justice Partners, et al.

James Kilbreth, Esq.
David Kallin, Esq.
84 Marginal Way, Ste 600
Portland, ME 04101

Charles Dingman, Esq.
PO Box 1058
Augusta, ME 04332

Jack Comart, Esq.
Robun Merril, Esq.
126 Sewall Street
Augusta ,ME 04330


**Defendant**

Ricker Hamilton, Commissioner, DHHS

Patrick Strawbridge, Esq.
Jeffrey M. Harris, Esq.
*Ten Post Office Sq. 8th floor*
*South PMB #706*
*Boston, MA 02109*

STATE OF MAINE
CUMBERLAND, ss

BUSINESS AND CONSUMER COURT
CIVIL ACTION
Doc. No. BCD-AP-18-02 ✓

MAINE EQUAL JUSTICE PARTNERS, )
CONSUMERS FOR AFFORDABLE )
HEALTH CARE, et al. )
          )
     Petitioners )
          )
v. )
          )
RICKER HAMILTON, COMMISSIONER )
MAINE DEPARTMENT OF HEALTH )
AND HUMAN SERVICES )
          )
     Respondent )

**ORDER ON M.R. CIV. P. 80C APPEAL
OF AGENCY ACTION**

I.  Background

On November 7, 2017, the people of Maine enacted "An Act to Enhance Access to

Affordable Health" ("2017 I.B. 2") by citizens' initiative. It was codified at 22 M.R.S. § 3174-

G(1)(H). 2017 I.B. 2 adds the following language to Section 3174-G:

> **1. Delivery of services.** The department shall provide for the delivery of
> federally approved Medicaid services to the following persons:
> …
> G. No later than 180 days after the effective date of this paragraph, a person under
> 65 years of age who is not otherwise eligible for assistance under this chapter and
> who qualifies for medical assistance pursuant to 42 United States Code, Section
> 1396a(a)(10)(A)(i)(VIII) when the person's income is at or below 133% plus 5%
> of the nonfarm income official poverty line for the applicable family size. The
> department shall provide such a person, at a minimum, the same scope of medical
> assistance as is provided to a person described in paragraph E.
>
> Cost sharing, including copayments, for coverage established under this
> paragraph may not exceed the maximum allowable amounts authorized under
> section 3173-C, subsection 7. No later than 90 days after the effective date of this
> paragraph, the department shall submit a state plan amendment to the United

1

States Department of Health and Human Services, Centers for Medicare and Medicaid Services ensuring MaineCare eligibility for people under 65 years of age who qualify for medical assistance pursuant to 42 United States Code, Section 1396a(a)(10)(A)(i)(VIII).

The department shall adopt rules, including emergency rules pursuant to Title 5, section 8054 if necessary, to implement this paragraph in a timely manner to ensure that the persons described in this paragraph are enrolled for and eligible to receive services no later than 180 days after the effective date of this paragraph. Rules adopted pursuant to this paragraph are routine technical rules as defined by Title 5, chapter 375, subchapter 2-A.

22 M.R.S. § 3174-G(1)(H), 2017 I.B. 2. By voting in favor of 2017 I.B. 2, the people of Maine voted to expand MaineCare coverage to low-income individuals under the age of 65 who qualify for assistance according to federal guidelines set out in 42 United States Code, Section 1396a(a)(10)(A)(i)(VIII). Expansion pursuant to 2017 I.B. 2 allows the State of Maine to take advantage of a provision of the Patient Protection and Affordable Care Act ("ACA") that extends Medicaid coverage to this group and offered complete federal cost coverage between 2013 and 2016, after which that federal contribution gradually decreases to a permanent 90% coverage in and after 2020.

2017 I.B. 2 requires the Commissioner to submit a state plan amendment ("SPA") to the United States Department of Health and Human Services, Centers for Medicare and Medicaid Services within 90 days of the effective date of 2017 I.B. 2; promulgate rules within 180 days of the effective date; and provide coverage to the above described group within 180 days of the effective date. Ninety days have passed since 2017 I.B. 2 was enacted and the Commissioner has not filed a SPA. Petitioners seek an order of the Court requiring the Commissioner to file a SPA immediately and adopt rules and provide coverage within the statutory deadline of 180 days from the effective date of 2017 I.B. 2.

2

II.     Standard of Review

When reviewing the determination of a government agency, the Court looks to issues of statutory construction de novo. *Munjoy Sporting & Ath. Club v. Dow*, 2000 ME 141, ¶ 7, 755 A.2d 531. If the agency's decision was committed to the reasonable discretion of the agency, the party appealing has the burden of demonstrating that the agency abused its discretion in reaching the decision. *See Sager v. Town of Bowdoinham*, 2004 ME 40, ¶ 11, 845 A.2d 567. "An abuse of discretion may be found where an appellant demonstrates that the decision maker exceeded the bounds of the reasonable choices available to it, considering the facts and circumstances of the particular case and the governing law." *Id*. Ultimately, the petitioner must prove that "no competent evidence" supports the agency's decision. *Seider v. Bd. of Examiners of Psychologists*, 2000 ME 206, ¶ 9, 762 A.2d 551 (citing *Bischoff v. Bd. of Trustees*, 661 A.2d 167, 170 (Me. 1995)). The mere fact that there is "[i]nconsistent evidence will not render an agency decision unsupported." *Id*.

Review of an agency's interpretation of statute is performed in the following manner:

> First, the court decides de novo whether the statute is ambiguous or unambiguous.
>
> Second, if the statute is unambiguous, the statute is construed directly, without deference to the agency's interpretation on the question of law. An agency cannot, by regulation, create an ambiguity in interpretation of a statute that does not otherwise exist.
>
> Third, if the statute is viewed as ambiguous, the agency's interpretation, although not conclusive, is reviewed with great deference and will be upheld unless contrary to the plain meaning of the statute.

Alexander, *Maine Appellate Practice* § 8(b)(3) (4th ed. 2013); citations omitted, *citing City of Bangor v. Penobscot County*, 2005 ME 35, ¶ 9, 868 A.2d 177; *Whitney v. Wal-Mart Stores, Inc.*, 2006 ME 37, ¶¶ 22-23, 895 A.2d 309; *Dep't of Corrections v. Pub. Utils. Comm'n*, 2009 ME 40,

3

¶ 8, 968 A.2d 1047; *S.D. Warren Co. v. Bd. Of Environmental Prot.*, 2005 ME 27, ¶¶ 4-5, 868 A.2d 210, *aff'd*, 547 U.S. 370; *Kane v. Comm'r of Dep't of Health and Human Servs.*, 2008 ME 185, ¶ 12, 960 A.2d 1196. "Only if the statute is ambiguous will we look to extrinsic indicia of legislative intent such as relevant legislative history." *Sabina v. JPMorgan Chase Bank, N.A.*, 2016 ME 141, ¶ 6; *quoting Strout v. Cent. Me. Med. Ctr.*, 2014 ME 77, ¶ 10, 94 A.3d 786.

III.    Discussion

A.  Record

Petitioners attached an affidavit of State Representative Andrew Gattine to their reply brief and used language suggesting a motion for the Court to take additional evidence. The Commissioner objects to the taking of additional evidence and to consideration of the Rep. Gattine affidavit "to the extent that Rep. Gattine's affidavit is offered in some capacity as a purported expert on the appropriations process or DHHS funding." The Commissioner does not object to Court consideration of the exhibits attached to the affidavit, but does not concede that the documents are relevant or accurate. At hearing, the Court offered the Commissioner the opportunity to submit additional documents to the record but the Commissioner declined the invitation.

In analyzing legislative intent, the Court will not consider Rep. Gattine's affidavit submitted by the Petitioners or any other material submitted by the parties created after the passage of 2017 I.B. 2. "[P]ost-enactment comments are not legally cognizable legislative history." *Seven Islands Land Co. v. Maine Land Use Regulation Com.*, 450 A.2d 475, 481 n. 9 (Me. 1982). Additionally, the Court denies any motion Petitioners may have made for the taking of additional evidence in their Reply Brief because any evidence presented would likely be post-

4

enactment comments. In terms of deciphering the Commissioner's reasons for not taking action

on 2017 I.B. 2, the Court will consider all documentation presented without objection.

### B. Ripeness

#### i. Questions before the Court

The Commissioner argues that because 180 days have not passed since the effective date

of 2017 I.B. 2, the question of whether or not the Commissioner is required to promulgate rules

or provide coverage is not yet ripe. 2017 I.B. 2 will have been effective for 180 days on July 2,

2018.[1] "[A] case is ripe when there exists a genuine controversy between the parties that presents

a concrete, certain, and immediate legal problem." *Johnson v. City of Augusta*, 2006 ME 92, ¶ 7,

902 A.2d 855. The Commissioner argues that because it has not yet failed to comply with 2017

I.B. 2's language concerning what must occur 180 days after its effective date, there is no

genuine controversy and the issue is not ripe for appeal. The Court finds that only the questions

concerning the filing of the SPA are ripe, not those pertaining to rulemaking or coverage because

the deadlines for those actions are still on the horizon.

#### ii. Effective Date

The Commissioner disputes the effective date of 2017 I.B. 2, arguing that the effective

date is in fact February 17, 2018, not January 3, 2018 as stated by the Petitioners. According to

the Maine Constitution:

> Any measure referred to the people and approved by a majority of the votes given
> thereon shall, unless a later date is specified in said measure, take effect and
> become a law in 30 days after the Governor has made public proclamation of the
> result of the vote on said measure, which the Governor shall do within 10 days
> after the vote thereon has been canvassed and determined; provided, however,
> that any such measure which entails expenditure in an amount in excess of
> available and unappropriated state funds shall remain inoperative until 45 days

---

[1] According to the Commissioner's argument, 2017 I.B. 2 will not have been effective for 180 days until August 16, 2018. See discussion below.

5

after the next convening of the Legislature in regular session, unless the measure provides for raising new revenues adequate for its operation.

Maine Const. Art. IV, pt. 3, § 19.

The Petitioners calculated the effective date as "30 days after the Governor has made public proclamation of the result of the vote", finding it to be January 3, 2018. The Commissioner argues that, because the 2017 I.B. 2 requires expenditures for which there have not yet been appropriations, and because the legislation itself did not provide for raising new revenues adequate for its operation, 2017 I.B. 2 "remain[ed] inoperative until 45 days after the next convening of the Legislature in regular session," bringing the effective date to February 17, 2018.

As Petitioner points out in its Reply, the operative date of legislation is delayed where the law "entails expenditure in an amount in excess of available and unappropriated state funds." The constitutional language does not concern itself with whether the funds have been appropriated for the purpose found in the new law, but instead whether there are "available and unappropriated funds." *See Maine Senate v. Sec. of State et al.*, 2018, ME 52, ¶ 30, __ A.3d __ (distinction between unappropriated and unavailable, appropriated funds). Petitioners further argue in their Reply Brief that there is reason to believe that there are available funds to cover the expenditures required by 2017 I.B. 2.[2]

Additionally, Petitioners argue that even were the Court to find that there were not unallocated, available funds to cover the expenditures required by 2017 I.B. 2, the effective date would still be January 3, 2018. What would have been delayed were there not unallocated,

---

[2] The Office of Fiscal and Program Review's estimate of available funds attached to Petitioners' Reply Brief exceed the alleged estimated expenditures. The Commissioner argues that the numbers in the OFPR estimate are current, but that the Court should instead be looking at figures as of the effective date of the statute. The Court declines both parties' requests to consider funding in order to calculate the effective date of 2017 I.B. 2.

6

available funds would be the date the law became operative, not the effective date. *See Opinion of the Justices*, 460 A.2d 1341, 1349-50 (Me. 1982). Finally, again as noted by Petitioners in their Reply Brief, until the Commissioner's Opposition Brief, the Commissioner appeared to concede the effective date of January 3, 2018 as is evidenced by the written effective date on 2017 I.B. 2.

The Court agrees with the Petitioners' argument that the cited constitutional provision may cause a statute to remain "inoperative" when there are insufficient available and unappropriated funds, but the effective date would be unchanged.[3] The Court finds that regardless of the "operative" date of 2017 I.B. 2, the effective date of 2017 I.B. 2 was January 3, 2018. Additionally, more than 90 days have elapsed since *both* the effective date proposed by the Petitioners and that proposed by the Commissioner. Therefore, the Court need not delve into the exact figures of when and whether there were and are sufficient unallocated, available funds to cover the expenditures required by 2017 I.B. 2.

C. Separation of Powers

The Commissioner argues that the Court does not have jurisdiction over the current controversy because compliance with 2017 I.B. 2 is a question of funding which may only be determined by the Legislature. The Commissioner contends that were the Court to weigh in, the Court would violate the separation of powers established in the Maine State Constitution.[4]

---

[3] What the Court finds most notable about the constitutional language providing for a later operative date for a measure referred to the people "which entails expenditure in an amount in excess of available and unappropriated state funds," is that the framers anticipated that there would be unfunded referenda and initiatives, and that not only would they not be funded, but that some of these unfunded referenda would require funding in excess of available state funds. In anticipation of such a situation, the framers expressed that they did not intend for the unfunded law to become unenforceable, but instead provided for the operation of the law to be delayed in order that the legislature have the time to carry out the will of the people.

[4] The Commissioner also objects to the Court's jurisdiction over the matter arguing that the current issue is a political question and therefore not appropriate for judicial review. As the Law Court has consistently held, "it is not our duty to judge the wisdom of legislative enactments." *Davies v. Bath*, 364 A.2d 1269, 1271 (Me. 1976). The Court is not entering the debate concerning whether or not MaineCare expansion is good policy. Following years of

7

According to the Maine Constitution, "[n]o person or persons, belonging to one [of the three branches of government], shall exercise any of the powers properly belonging to either of the others, except in the cases herein expressly directed or permitted." Me. Const. art. III, §§ 1-2. "Each of the three departments being independent, as a consequence, are severally supreme within their legitimate and appropriate sphere of action." *Ex parte Davis*, 41 Me. 38, 53 (Me. 1856.

As explained in Marshall Tinkle's *The Maine State Constitution*,

> Section 1 [of the Maine State Constitution] broadly distributes all governmental power into the legislative, executive, and judicial departments. These are distinct, co-equal branches of state government. In general, the first branch enacts laws, the second approves and executes them, and the third expounds and enforces them....
> The doctrine of separation of powers presupposes that a member of one branch of government may not undertake the duties properly belonging to another branch. Thus, this section prevents the judiciary from restricting or enlarging interpretation to laws in conflict with properly rendered judicial opinion, and the legislature from attempting to enact laws that the court declares unconstitutional."

Tinkle, *The Maine State Constitution* 70-71 (2d ed. 2013). As recently explained by the U.S. Supreme Court of the U.S. Constitution, "[t]o the Framers, the separation of powers and checks and balances were more than just theories. They were practical and real protections for individual liberty in the new Constitution." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. __, 135 S. Ct. 1199, 1216 (2015). "The Framers were well aware of the natural desire of office holders as well as others to seek to expand the scope and authority of their particular office at the expense of others. They sought to provide against success in such efforts by erecting adequate checks and balances in the form of grants of authority to each branch of the government in order to counteract and prevent usurpation on the part of the others." *Furman v. Ga.*, 408 U.S.

debate between the legislative and executive branches, any question concerning the wisdom of the current policy has been resolved, at least for the time being, by the people's initiative enacting 2017 I.B. 2.

8

238, 469-470 (1972). As in the U.S. Constitution, the checks and balances of the Maine Constitution maintain the separation of powers among the branches of government and the independent liberties of the governed.

To that end, the Court recognizes it does not have the authority to require the Legislature to appropriate funds, especially in a case such as this one where the act in question, namely the submission of the SPA, may be performed without appropriation. *Maine Senate,* 2018 ME 52, ¶ 30, __ A.3d __. However, it is the Court's role to interpret the law in the context of a controversy, such as is currently before it. As the Law Court recently wrote in *Maine Senate,* "our constitutional structure does not require that the Judicial Branch shrink from a confrontation with the other two coequal branches." *Id.* ¶ 29; citing *Raines v. Byrd,* 521 U.S. 811, 833 (1997) (Souter, J., concurring). In fact the vehicles by which the Petitioners have brought this action, Maine Rule of Civil Procedure 80C and the Maine Administrative Procedures Act, were created in anticipation of cases such as this one, in which a party seeks to challenge the actions of an administrative body for decisions "(1) In violation of constitutional or statutory provisions; (2) In excess of the statutory authority of the agency; (3) Made upon unlawful procedure; (4) Affected by bias or error of law; (5) Unsupported by substantial evidence on the whole record; or (6) Arbitrary or capricious or characterized by abuse of discretion." 5 M.R.S. § 11007.

The Law Court did just that in *Manirakiza v. Dep't of Health and Human Services.* In *Manirakiza,* following a legislative amendment expanding food stamp benefits, the Department of Health and Human Services argued that the Court could not require its compliance with the amended statute because doing so would require appropriations, thereby violating the separation of powers. *Manirakiza v. HHS,* 2018 ME 10, 177 A.3d 1264. The Law Court found that engaging in statutory analysis could not violate the separation of powers and held that DHHS

9

was required to provide food stamp benefits to those newly eligible because of the amendment "in the same way that it must provide food assistance to those persons eligible under" the earlier enacted provisions. *Id.* ¶ 15. In this case, as in *Manirakiza*, it is the duty of the Court to interpret the legislative intent of L.D. 1039 and review the Commissioner's decisions, regardless of the status of appropriations.

D. Statutory Interpretation

Law created through the initiative process "is evaluated under the ordinary rules of statutory construction." *League of Women Voters v. Sec. of State*, 683 A.2d 769, 771 (Me. 1996). The general rules of statutory interpretation require the Court to interpret statutes by their plain language where the language is unambiguous. *Arsenault v. Sec. of State*, 2006 ME 111, ¶ 11, 905 A.2d 285; *Opinion of the Justices*, 460 A.2d 1341, 1345 (Me. 1982) ("Where the meaning of terms used in a statute is plain, we need look no further to conclude that the law means exactly what it says.") In this case, when read as a whole, the statute is clear and unambiguous. Coverage shall be extended "no later than 180 days after the effective date" of 2017 I.B. 2, the state plan amendment shall be submitted "no later than 90 days after the effective date," and the department shall adopt rules to implement the expansion within 180 days of the effective date. If there were any question as to the meaning of the word "shall," 1 M.R.S. § 71 defines shall, must, and may as indicating "a mandatory duty, action or requirement." 1 M.R.S. § 71.

Nevertheless, the Commissioner argues that the language setting out the timeline for the tasks to be accomplished – namely the SPA, rulemaking, and expansion of coverage – is directory rather than mandatory. The Commissioner cites to *Anderson v. Comm'r of Dep't of Human Services* in support of his argument. In *Anderson*, the Petitioner appealed the recovery of overpayment of Aid to Families with Dependent Children benefits, conceding the overpayment,

10

arguing that the Department violated federal and state regulations requiring that the agency take action to recover overpayment by the end of the quarter following the quarter in which the overpayment is first identified, and therefore the agency should be estopped from recovery. *Anderson v. Comm'r of Dep't of Human Services*, 489 A.2d 1094, 1096-97 (Me. 1985). Despite clear regulatory language concerning the time in which the agency was to take action to recover overpayment, the Law Court considered the Department's argument that the language of the regulations proscribing the time in which the Department had to act in order to recover overpayment of benefits was directory language, not mandatory. The Court cited to 1A Sutherland, *Statutes and Statutory Construction* § 25.03 at 298-99 (4th ed. C. Sands ed. 1972):

> Generally those directions which are not of the essence of the thing to be done, but which are given with a view merely to the proper, orderly and prompt conduct of the business, and by the failure to obey no prejudice will occur to those whose rights are protected by the statute, are not commonly considered mandatory. Likewise, if the act is performed but not in the time or in the precise manner directed by the statute, the provision will not be considered mandatory if the purpose of the statute has been substantially complied with and no substantial rights have been jeopardized.

*Anderson*, 489 A.2d at 1098 (Me. 1985). In its analysis, the Law Court found that the general purpose of the regulations concerning the time in which the agency seeks to recover overpayment was to reduce federal spending. *Id*. at 1098. Additionally, the Law Court found that there was no negative effect on the plaintiff because the overpayment had ceased to accrue before the Department identified the error. *Id*. Because the Law Court found that the recovery timeline set out in the regulation spoke to the "orderly and prompt conduct of business" rather than "the essence of the thing to be done;" and "by the failure to obey no prejudice will occur to those whose rights are protected by statute," the Law Court found that the regulation timelines were directory rather than mandatory, requiring substantial compliance rather than strict compliance. *Id*. at 1099.

11

The Commissioner argues that the facts of the current matter track those of *Anderson*, and the Court should find that the language of 2017 I.B. 2 is directory instead of mandatory. Petitioners argue that *Anderson* predated 1 M.R.S. § 71, and was thus replaced by 1 M.R.S. § 71, which statutorily clarified that the word "shall" indicates that the thing to be done is mandatory.

The Court need not make a determination as to whether the language of 2017 I.B. 2 is mandatory or directory, because even if the language is directory as the Commissioner suggests, the Commissioner has not substantially complied with 2017 I.B. 2. A finding that statutory language is directory rather than mandatory does not permit non-compliance. Even where statutory language is directory, the agency must substantially comply. *Id.* at 1098. In this case, the Commissioner has taken no action at all to submit the SPA according to 2017 I.B. 2. He argues that his obligations do not begin until the appropriations are made. The Court disagrees. The Court is not persuaded that the executive branch is excused from clear statutory obligations by the legislature's failure to follow through with legislative obligations - as defined by the executive branch. The Commissioner has not cited to any authority suggesting that an agency can be considered to have substantially complied with a directory statute by taking no action at all. The Court concludes that the Commissioner's complete failure to act cannot be considered substantial compliance with 2017 I.B. 2.[5]

---

[5] The Commissioner cites to three sections of Title 5 of the Maine Revised Statutes in support of its argument that "specifically restrict—under penalty of criminal prosecution—the authority of the Commissioner (and other state officials) to exceed the limits of appropriated funds." The Court finds that the cited statutes do not apply to the current controversy. Section 1543 states: "Money may not be drawn from the State Treasury except in accordance with appropriations duly authorized by law. Every disbursement from the State Treasury must be upon the authorization of the State Controller and the Treasurer of State…" 5 M.R.S. § 1543. Section 1543 does not apply because no money need be drawn from the State Treasury in order for the Commissioner to submit the SPA. Section 1582(1) states: "A state department may not establish a new program or expand an existing program beyond the scope of the program already established, recognized and approved by the Legislature until the program and the method of financing are submitted to the Department of Administrative and Financial Services, Bureau of the Budget for evaluation and recommendation to the Legislature and until the funds are made available for the program by the Legislature." 5 M.R.S. § 1582(1). This section is not applicable because 2017 I.B. 2 expands the MaineCare program through legislation, no expansion has been accomplished by a state department. Finally, 5 M.R.S. § 1583 states: "No agent or officer of the State or any department or agency thereof, whose duty it is to expend money

12

IV.  Conclusion

The Court Orders the Commissioner to submit a state plan amendment to the United States Department of Health and Human Services, Centers for Medicare and Medicaid Services ensuring MaineCare eligibility for people under 65 years of age who qualify for medical assistance pursuant to 42 United States Code, Section 1396a(a)(10)(A)(i)(VIII) by June 11, 2018.

The Clerk is directed to incorporate this Order into the docket by reference pursuant to M.R. Civ. P. 79(a).

**DATE:**  6/-1/18

_____
**Michaela Murphy**
**Justice, Superior Court**

Entered on the Docket: 6-4-18
Copies sent via Mail___Electronically ✓

---

under an appropriation by the Legislature, shall contract any obligation on behalf of the State in excess of the appropriation. Whoever exceeds in his expenditure said appropriation shall not have any claim for reimbursement. Any person who knowingly violates this section shall be guilty of a Class E crime." 5 M.R.S. § 1583. Because this case addresses only the SPA, and because no money need be expended to submit the SPA, the Court finds that this section also does not apply. The Commissioner further argues that the SPA would act as a binding contract requiring the Commissioner to expend money that has not been appropriated, and thereby causing the Commissioner to act in violation of Section 1583. The Court is not persuaded by the Commissioner's argument as it seems clear from the record that federal law permits States to withdraw from Medicaid expansion, and the Legislature is always free to amend or repeal the statute before the Court.

13